Tavy A. Dumont, SBN 244946
LAW OFFICE OF TAVY A. DUMONT
51 East Campbell Avenue, Suite 106-K
Campbell, California  95008-2054
Telephone: (408) 866-4460
Facsimile: (408) 866-4461
Email:  tavy.dumont@dumontlaw.com

Attorney for Plaintiff
HEATHER L. NEWTON
and the Proposed Class

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| HEATHER L. NEWTON, individually and on behalf of others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>AMERICAN DEBT SERVICES, INC. a California corporation;<br>QUALITY SUPPORT SERVICES, LLC, a California limited liability company;<br>GLOBAL CLIENT SOLUTIONS, LLC;<br>ROCKY MOUNTAIN BANK & TRUST; and DOES 1-100,<br><br>  Defendants. | Case No.:  5:11-cv-03228  HRL<br><br>**FIRST AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>1. **Violations of Cal. Civ. Code §§ 1750,** *et seq*.**;**<br>2. **Violations of 15 U.S.C. §§ 1679,** *et seq*.**;**<br>3. **Violations of Cal. Bus. & Prof. Code §§ 17200,** *et seq*.**;**<br>4. **Interference with Contractual Relations;**<br>5. **Negligence**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Action filed:  June 29, 2011<br>Trial date:  None Set |

Plaintiff Heather L. Newton brings this action on her own behalf and on behalf of a Class of persons defined below, and alleges on information and belief as follows:

**INTRODUCTION**

1. Plaintiff brings this action on behalf of herself and a Class of persons who paid Defendants advance fees for debt reduction services and credit repair services.

2. Defendants participated in a scheme wherein Plaintiff and other consumers were told that Defendants' services would wipe out the consumers' debts for a fraction of the amount owed, and improve the consumers' credit.

3. Defendants represented to consumers that Defendants' program is as follows:

   a. Upon entering the program, the consumer is to stop making payments to or communicating with creditors;

   b. Instead, the consumer is to allow Defendants to debit the consumer's checking account every month;

   c. As a result of the debits, Defendants will receive and accumulate the consumer's money;

   d. Defendants will deduct a fee from the money, as compensation for services;

   e. Defendants will negotiate with the consumer's creditors to settle the consumer's debts for a partial payment of the obligation;

   f. Defendants will then distribute the money among the creditors.

4. Defendants divided up these various functions among themselves, with Defendant Global Client Solutions, LLC ("GCS") initiating the debits from the consumer's bank account and later initiating transfers distributing the money among creditors, Defendant Rocky Mountain Bank & Trust ("RMBT") receiving and accumulating the consumer's money, and Defendant Quality Support Services, LLC ("QSS") negotiating with the consumer's creditors.  Defendants American Debt Services, Inc. ("ADS") and DOES 1-80 advertised the services, procured clients and delivered them to the other Defendants.

5. In doing the above, Defendants acted as a "prorater," making them subject to the California law regulating proraters, California Financial Code sections 12000, *et seq*.

6. Under California Financial Code section 12002.1, "A prorater is a person who, for compensation, engages in whole or in part in the business of receiving money or evidences

thereof for the purpose of distributing the money or evidences thereof among creditors in payment or partial payment of the obligations of the debtor."

7. Defendants collectively acted as a prorater under the California law in that, at the direction of and induced by the promises of ADS and QSS, Plaintiff opened a "Special Purpose Account" at RMBT, which required her to authorize RMBT "through its agent Global [Client Solutions] to initiate debit entries to my checking account…for the purpose of transferring funds to my [Special Purpose Account at RMBT]," "for the purpose of accumulating funds to repay my debts… ."

8. Thus, Defendants "engage[d] in the business of receiving money…for the purpose of distributing the money…among creditors in…partial payment of the obligations of the debtor," making them subject to California Financial Code sections 12000, *et seq*.

9. Defendants operated without a valid license issued by the Department of Corporations as required by California Financial Code section 12200 for a business acting as a prorater, and charged fees in excess of the maximum allowed by law.

10. The maximum fee a prorater may charge under California Financial Code section 12314 is twelve percent for the first three thousand dollars distributed to the consumer's creditors (and lesser percentages thereafter.)

11. Here, Defendants distributed $2,200.00 to Plaintiff's creditors and were entitled at most to twelve percent of that, or $264.00.  Instead, Defendants took a fee of $1,936.46, more than seven times the legal limit.

12. Defendants uniformly and systematically charge all the Class members fees that exceed the maximum allowed by law, by charging more than twelve percent, basing the fee on the consumer's total indebtedness instead of the amount distributed, front-loading the fees, charging a monthly maintenance fee, and refusing to refund fees when a consumer drops out of the program before debts are settled.

13. Because Defendants charged fees in excess of the maximum allowed by law, Defendants' contracts with Plaintiff and the Class members are void under California Financial Code section 12316.

14. Defendants further violated California Financial Code section 12324, subdivision (a), by offering consumers a bonus for referring prospective customers.

15. Defendants also violated the Credit Repair Organization Act (CROA), 15 U.S.C. sections 1679, *et seq.*, by representing to consumers that an express or implied purpose of the services is to improve the consumers' credit rating, and charging money before the services were fully performed.

## JURISDICTION

16. This action arises under a federal statute, the Credit Repair Organization Act, 15 U.S.C. sections 1679, *et seq.* Furthermore, Plaintiff seeks to maintain a class action, Defendants Global Client Solutions, LLC and Rocky Mountain Bank & Trust are domiciled outside California, and the amount in controversy exceeds $5,000,000.

## INTRADISTRICT ASSIGNMENT

17. This action may be properly heard in this judicial district because (a) the Defendants, and each of them, conduct continuous, systematic and substantial business in this county; (b) Defendant American Debt Services, Inc., has its headquarters and principal place of business in this county; (c) the Plaintiff resides in this county; and (d) the contract between the Plaintiff and RMBT and GCS was entered into in this county.

## PARTIES

18. Plaintiff Heather L. Newton is, and at all times mentioned herein was, a resident of Santa Clara County, California.

19. Defendant American Debt Services, Inc. is a California corporation with its principal place of business and headquarters in Santa Clara County, California.

20. Defendant Quality Support Services, LLC is a California limited liability company with its principal place of business and headquarters in Orange County, California.

21. Defendant Global Client Solutions, LLC is a limited liability company with its principal place of business and headquarters in Tulsa, Oklahoma.

22. Defendant Rocky Mountain Bank & Trust is a chartered Colorado state bank with its principal place of business and headquarters in Colorado.

23. The true names and capacities of the defendants sued as DOES 1-100 are unknown to Plaintiff. Each of the Doe Defendants is a partner, agent, alter ego and/or co-conspirator of the other Defendants, and is responsible in some manner for the occurrences herein alleged, and proximately caused Plaintiff's and the Class members' damages. Plaintiff will amend her complaint to add those Defendants' true names when their identities are discovered.

24. Unless otherwise required by the context of the allegation, references to the Defendant(s) includes their parents, subsidiaries, affiliates, divisions, predecessors, successors, assigns, administrators, associates, alter egos, joint ventures, joint venturers, related or affiliated entities, partners, owners, managers, contractors, agents, servants, employees, assistants and/or consultants.

25. Unless otherwise alleged, whenever reference is made in this Complaint to any act of any business entity Defendant, such allegations shall mean that the Defendant did the act through its employees, agents or representatives while they were acting within the actual or ostensible scope of their authority.

26. At all relevant times alleged in this Complaint, each of the Defendants has acted as an agent, representative or employee of other named Defendants and acted within the scope of that agency, representation or employment.

27. Each Defendant, when acting as the agent of another Defendant, carried out a joint scheme, business plan or policy in all respects pertinent hereto, making the acts of each Defendant, when acting as the agent of another Defendant, legally attributable to the other Defendant.

28. Each Defendant, when acting as a principal, caused, knew of, and/or should have known of the wrongful actions of each and every one of its agents, servants, employees, assistants and/or consultants.

Page 5

FIRST AMENDED CLASS ACTION COMPLAINT    CASE NO. 5:11-CV-03228 HRL

29. Each Defendant, when acting as a principal, ratified the wrongful actions of each and every one of its agents, servants, employees, assistants and/or consultants.

30. Defendants are estopped from relying on any statutes of limitation by virtue of their fraudulent concealment.

## GENERAL ALLEGATIONS

31. In approximately August 2009, Plaintiff Heather L. Newton responded to an advertisement purportedly by American Debt Services, Inc. ("ADS").

32. Plaintiff called the advertised telephone number and spoke to a salesman who told her that the services could settle her credit card debt for half of the balance owed, and that her credit would not be negatively impacted after completion of the program.

33. While the salesman was on the telephone with Plaintiff, he directed her to go to her computer and access a website, where he directed her to enter various information about herself and click on various things on the screen.

34. Some days later, Plaintiff received a "Welcome Packet" containing a "Special Purpose Account Application" and "Account Agreement and Disclosure Statement."

35. Plaintiff later learned that the "Welcome Packet" came from Defendant Quality Support Services ("QSS") even though it bore ADS's name, and her subsequent contacts, purportedly with employees of ADS, were actually with QSS.

36. The "Welcome Packet" stated, in part:
   a. Defendants settle debt at an average "40% to 60% on the dollar";
   b. The debt settlement program "may have a short term negative effect" on the consumer's credit, but that the consumer's "credit score should improve after successfully completing the program";
   c. Once negotiated and settled, creditors will report the accounts as "settled as agreed" or "balance 0";
   d. The consumer's "debt-to-income ratio," which is "an important measurement by which creditors evaluate applicants for auto and home loans" should improve as a result of the debt settlement program;

Page 6

FIRST AMENDED CLASS ACTION COMPLAINT                   CASE NO. 5:11-CV-03228 HRL

  e. It is not typical for consumers to be sued by creditors while in the debt settlement program; and

  f. In the event the consumer receives notice of litigation, the consumer should immediately contact Defendants' Client Services Department, whose "Client Services Specialists have the training available to assist [the consumer]."

37. Plaintiff filled out the forms in the Welcome Packet and returned them to Defendants, thereby authorizing Defendants to establish a "Special Purpose Account" with Rocky Mountain Bank & Trust ("RMBT").

38. The forms in the Welcome Packet further authorized RMBT, "through its agent Global [Client Solutions]," to debit her bank account at Golden One Credit Union to fund the account at RMBT.

39. The forms further authorized Global Client Solutions ("GCS") to transfer 100% of Plaintiff's first three monthly payments to Defendants as non-refundable fess—totaling over $1,200.00—and to transfer over 25% of each subsequent payment to Defendants as non-refundable fees.

40. The forms further authorized GCS to transfer funds directly to Plaintiff's creditors pursuant to negotiated settlements.

41. Following instructions from Defendants, Plaintiff stopped communicating with her creditors.

42. In March 2010, a representative of one of Plaintiff's creditors, Bank of America, called Plaintiff and told her that her credit card account was seriously past due. Plaintiff informed the representative that she was in a payment plan through Defendants, and that Defendants were supposed to be taking care of creditor communications and payments for her.

43. The Bank of America representative informed Plaintiff that Bank of America had not been contacted by Defendants or anyone else regarding Plaintiff's debt, and that any payments she was making into the payment plan were not reaching Bank of America.

44. The representative also informed Plaintiff that Bank of America does not work with debt settlement companies.

45. The representative told Plaintiff that this was the "end of the road," and she must either pay Bank of America $2,200, in four payments of $550 over the next four months, or the matter would be referred to an attorney for litigation. Plaintiff agreed to make the payments.

46. By this point in time, Defendants had debited Plaintiff's checking account for $2,806.05; however, because of the fees Defendants deducted, there was only about $1,200 in Plaintiff's Special Purpose Account.

47. Plaintiff contacted Defendants and asked them to pay $1,100 to Bank of America to satisfy the first two $550 payments required by Bank of America.

48. Defendants initially refused to release any money from Plaintiff's Special Purpose Account, because they had not negotiated the settlement.

49. Defendants ultimately agreed to release $1,100 from Plaintiff's Special Purpose Account to Bank of America to satisfy the first two $550 payments, but only after Plaintiff agreed that the third and fourth $550 payments to Bank of America would also be channeled through the program.

50. This meant that in order to pay the third and fourth payments, totaling $1,100, to Bank of America, Plaintiff had to tender an additional $1,400 to Defendants, and allow Defendants to keep approximately 25% for fees, even though they had provided no services.

51. In April 2010 while Plaintiff was dealing with the threatened litigation and settlement with Bank of America, Plaintiff was served with a summons and complaint in a collection action by another of her creditors, Chase.

52. Plaintiff contacted Defendants' "Client Services Department" as instructed, told them of the lawsuit by Chase, and asked for the assistance that had been promised.

53. Contrary to the earlier representation that "Client Specialists would have the training available to assist" her if she was sued, the Client Services Specialist told Plaintiff that there was nothing they could do to help her, other than to recommend that she go to the courthouse and ask the clerk what to do.

54. Plaintiff then reestablished communications with her creditors, and learned that Defendants had not initiated any communications with any of her creditors in the eight months since she entered the program.

55. With help from a pro bono legal clinic, Plaintiff obtained a fee waiver and filed an answer to the Chase complaint, in propia persona.

56. Plaintiff later settled the matter with Chase, with no negotiating help given or offered by Defendants.

57. On June 30, 2010, as soon as Defendants made the last payment to Bank of America to satisfy the earlier settlement, Plaintiff sent ADS a certified letter stating that she was terminating the services, and requesting a refund of all money in her Special Purpose Account. United States Post Office records show that ADS received the termination letter July 2, 2010.

58. Nevertheless, Defendants attempted to debit Plaintiff's Golden One Credit Union account for $400.15 on July 7, 2010, five days after receiving Plaintiff's notice terminating the services. The only reason the debit was not successful was that Plaintiff had already closed the Golden One account.

59. Defendants ultimately refunded $70.04 to Plaintiff. Defendants did not refund any of the service fees or transaction fees.

60. All in all, Plaintiff paid a total of $4,206.50 into the Special Purpose Account at Rocky Mountain Bank & Trust. Of that, $70.04 was refunded to her at termination; $2,200.00 went to her creditor Bank of America (pursuant to the settlement that she obtained without any help from Defendants); and Defendants split $1,936.46 despite having performed no creditor communications or negotiations on Plaintiff's behalf whatsoever.

61. After she terminated the services, Plaintiff requested a copy of any contracts governing the services. Defendant ADS sent her a purported contract that Plaintiff has no recollection of ever having seen, that does not have her signature on it, and whose terms contradict the representations made in the "Welcome Letter," which she does recall receiving.

## CLASS ACTION ALLEGATIONS

62. This action is brought, and may properly be maintained, as a class action pursuant to the provisions of the Federal Rules of Civil Procedure.

63. The four Rule 23(a) prerequisites are satisfied here, in that (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

64. *Definition.* Plaintiff brings this class action on behalf of herself and a Class defined as follows:

> All consumers who paid QSS directly, or indirectly through a person or entity that contracted with QSS, for debt reduction services during the four years preceding filing of the complaint, who opened a Special Purpose Account with RMBT and GCS, and did not receive a full refund of fees.

Excluded from the Class are: (a) Judges participating in this action and members of their immediate families; (b) Defendants and any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants; (c) Defendants' legal representatives, assigns and successors; (d) Plaintiff's attorneys and their employees; and (e) all persons who properly execute and file a timely request for exclusion from the Class.

65. *Numerosity.* The Class is believed to be composed of thousands of persons, geographically dispersed, the joinder of whom in one action is impractical.

66. *Ascertainability.* The Class is ascertainable and identifiable. Membership in the Class can be determined easily from the Defendants' own records.

67. *Commonality.* Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class. These common legal and factual issues include the following:

    a. Whether Defendants activities are regulated by California Financial Code sections 12000, *et seq.*;

   b. Whether Defendants' practices violate California Financial Code sections 12000, *et seq.*;

   c. Whether Defendants are subject to the Credit Repair Organization Act, 15 U.S.C. sections 1679, *et seq.*;

   d. Whether Defendants' practices violate 15 U.S.C. sections 1679, *et seq.*;

   e. Whether Defendants violated California Civil Code sections 1750, *et seq.*;

   f. Whether Defendants misrepresented their services;

   g. Whether Defendants should be enjoined from making such representations;

   h. Whether Defendants should be enjoined from collecting compensation in advance of delivering services; and

   i. Whether Plaintiff and the Class are entitled to restitution and/or disgorgement.

68. *Typicality.* Plaintiff's claims are typical of the claims of the Class members, as all such claims arise out of Defendants' conduct in soliciting clients for debt reduction and credit repair services, making representations about those services, and collecting compensation in advance of delivering services.

69. *Adequacy of Representation.* Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class.

70. *Predominance and Superiority.* The requirements of Rule 23(b) are satisfied here, in that common questions of law or fact predominate and the class action is superior to other available methods of adjudication.  This Class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Were individual Class members be required to bring separate actions, the Courts would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which

inconsistent results could magnify the delay and expense to all parties and the court system, this Class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

## COUNT ONE

(Violations of the Consumer Legal Remedies Act)

(By Plaintiff and the Class against All Defendants)

71. Plaintiff realleges and incorporates by reference each of the preceding allegations as though fully set forth hereafter.

72. The services covered by the Class members' contracts were bought primarily for personal, family or household purposes.

73. Defendants engaged in unfair or deceptive acts and practices intended to result in, and that did result in, the sale of services to consumers.

74. By representing that services would be performed by local companies such as ADS and DOES 1-80, when the company actually interacting with Plaintiff and the Class members was QSS, Defendants passed off their services as those of another as proscribed by Civil Code section 1770, subdivision (a)(1) and misrepresented the source of services as proscribed by subsection (a)(2).

75. By representing that they settle debt at an average 40% to 60% on the dollar, but failing to disclose that this statistic is based not on the original debt when the consumer enters the program, but on the inflated debt resulting from months of non-payment, late fees and penalties, Defendants advertised services with intent not to sell them as advertised, as proscribed by Civil Code section 1770, subdivision (a)(9).

76. By representing that they settle debt at an average 40% to 60% on the dollar, but failing to disclose that this statistic is based not on the original debt when the consumer enters the program, but on the inflated debt resulting from months of non-payment, late fees and penalties, Defendants represented that services have benefits which they do not have, as proscribed by Civil Code section 1770, subdivision (a)(5).

Page 12

77. By representing that they settle debt at an average 40% to 60% on the dollar, but failing to disclose that the majority of clients' debts are not settled at all because they drop out of the program, Defendants represented that services have benefits which they do not have, as proscribed by Civil Code section 1770, subdivision (a)(5).

78. By representing that clients' credit should be improved as a result of the services, Defendants represented that services have benefits which they do not have, as proscribed by Civil Code section 1770, subdivision (a)(5).

79. By representing that Plaintiff and the Class members were obligated to pay a fee equal to 15% of the debt enrolled in the program, collected in advance, Defendants represented that the transactions confer or involve rights, remedies, or obligations which they do not have or which are prohibited by law, as proscribed by Civil Code section 1770, subdivision (a)(14).

80. Plaintiff relied on Defendants' representations.

81. As a result of these Civil Code section 1770 violations, Plaintiff and the Class have suffered injury and lost money.

82. On July 11, 2011, Plaintiff sent to each of the Defendants the demand letter prescribed by Civil Code section 1782, subdivision (a).

83. More than thirty days have passed, and none of the Defendants has agreed to identify all consumers similarly situated and notify those consumers that upon their request Defendants will make an appropriate remedy, as required by Civil Code section 1782, subdivision (c). Therefore, Plaintiff now amends her complaint to request damages under the CLRA.

## COUNT TWO

(Violations of the Credit Repair Organizations Act, 15 U.S.C. §§ 1679, *et seq*.)

(By Plaintiff and the Class against All Defendants)

84. Plaintiff realleges and incorporates by reference each of the preceding allegations as though fully set forth hereafter.

FIRST AMENDED CLASS ACTION COMPLAINT                                      CASE NO. 5:11-CV-03228 HRL

85. Defendants used the United States mails and wires to represent to consumers that Defendants would provide assistance with regard to improving the consumers' credit record, credit history, or credit rating, by representing that

   a. the consumers' "credit score should improve" after successfully completing the program;
   b. the consumers' ability to obtain credit would be better after the program than before, in that the consumers' "debt-to-income ratio," which is "an important measurement by which creditors evaluate applicants for auto and home loans" should improve as a result of the debt settlement program; and
   c. once negotiated and settled, creditors would report the consumers' debts as "settled as agreed" or "balance 0."

86. Because they used instrumentalities of interstate commerce to represent that Defendants would provide assistance with regard to improving consumers' credit, Defendants are Credit Repair Organizations subject to the Credit Repair Organizations Act, 15 U.S.C. section 1679, *et seq.*

87. Defendants violated 15 U.S.C. section 1679b, subdivision (a)(1), by making misleading statements with regard to creditors' reporting of settled debts as "settled as agreed" or "balance 0."

88. Defendants violated 15 U.S.C. section 1679b, subdivision (b), by charging and receiving money before services were fully performed.

89. As a result of Defendants' conduct, Plaintiff and the Class members have suffered injury and lost money.

## COUNT THREE

(Violations of the Unfair Competition Law)

(By Plaintiff and the Class against All Defendants)

90. Plaintiff realleges and incorporates by reference each of the preceding allegations as though fully set forth hereafter.

91. California Business and Professions Code sections 17200, *et seq.*, also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any unlawful, unfair, fraudulent or deceptive business act or practice.

92. Defendants' conduct alleged herein constitutes unfair, unlawful, or fraudulent acts or practices within the meaning of Business and Professions Code sections 17200, *et seq*.

93. Plaintiff actually relied on Defendants' deceptive statements and omissions of material fact in entering into the contract, and paid money to Defendants in reliance thereon.

94. As a direct result of Defendants' unfair, unlawful, or fraudulent acts and practices, Class members sustained injuries in fact and lost money or property.

95. As a direct and proximate result of Defendants' practices, Defendants have been unjustly enriched and should be ordered to make restitution to Class members pursuant to Business and Professions Code sections 17203 and 17204.

96. Defendants' unlawful, unfair and fraudulent business practices alleged herein present a continuing threat to Plaintiff, the Class and members of the public in that on information and belief Defendants persist and continue to engage in these practices, and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct is causing and will continue to cause irreparable injury to Plaintiff, the Class and members of the public unless enjoined or restrained.

97. Defendants violated the UCL as alleged above and in the following regards.

<u>Violations of the CLRA</u>

98. *Unlawful.* Defendants' conduct was and is unlawful insofar as it violates the Consumer Legal Remedies Act, Civil Code section 1750, *et seq.*

99. *Unfair.* Defendants' conduct in violation of the CLRA was and is unfair in that the harm to consumers, from paying illegal fees and being misled to believe that the services have benefits they do not have, outweighs the utility of the above described conduct.

100. *Fraudulent.* Defendants' conduct in violation of the CLRA was and is fraudulent in that it tends to mislead the general public.

FIRST AMENDED CLASS ACTION COMPLAINT         CASE NO. 5:11-CV-03228 HRL

<u>Violations of the CROA</u>

101. *Unlawful.* Defendants' conduct was and is unlawful insofar as it violates the Credit Repair Organizations Act, 15 U.S.C. sections 1679, *et seq*.

102. *Unfair.* Defendants' conduct in violation of the CROA was and is unfair in that the harm to consumers from Defendants' conduct, in charging advance fees and misrepresenting the effect of its services on consumers' credit, outweighs the utility of that conduct.

103. *Fraudulent.* Defendants' conduct in violation of the CROA was and is fraudulent in that it tends to mislead the general public.

<u>Violations of California Financial Code sections 12000, *et seq.*</u>

104. *Unlawful.* Defendants' conduct was and is unlawful insofar as it violates California Financial Code sections, 12000, *et seq*.

105. *Unfair.* Defendants' conduct in violation of California Financial Code sections 12000, *et seq*., was and is unfair in that the harm to consumers from Defendants' charging of excessive fees outweighs the utility of that conduct.

106. *Fraudulent.* Defendants' conduct in violation of California Financial Code sections 12000, *et seq*., was and is fraudulent in that it tends to mislead the general public, who are likely unaware that Defendants lack the legally required licensure, and charge fees that exceed those permitted by law.

<u>RMBT's Ongoing Business Relationship with GCS and QSS</u>

107. *Unlawful.* RMBT's ongoing business relationship with GCS and QSS is unlawful, in that it violates the Federal Deposit Insurance Corporation's Cease and Desist Order of April 2, 2009, which orders RMBT to "provide adequate and effective oversight over the Bank's third-party relationships, specifically focusing on monitoring the activities of third-party payment processors and their customers, who are referred to herein as Debt Settlement Companies ("DSC")." The Cease and Desist Order further orders RMBT to [e]nsure that payment processors… and DSCs rectify harmful consumer activity or the Bank shall cease operations with the payment processor… and/or DSC" by June 1, 2009. Yet after June 1,

2009, RMBT continued in business with GCS and QSS, who in turn continued their harmful consumer activity, including making the above-described misrepresentations to Plaintiff in August 2009.

108. *Unfair.* Defendants' conduct in violation of the Cease and Desist Order was and is unfair in that the harm to consumers from Defendants' conduct outweighs the utility of that conduct.

109. *Fraudulent.* Defendants' conduct in violation of California the Cease and Desist Order was and is fraudulent in that it tends to mislead the general public.

110. Defendants have been and will continue to be unjustly enriched by their unfair, unlawful, or fraudulent acts and practices as alleged herein. In order to undo the unjust enrichment, and in order to prevent the unjust enrichment in the future, the Class members are entitled to restitution, and the Class members and the general public are entitled to injunctive relief.

111. Plaintiff requests an award of attorneys' fees and costs pursuant to Code of Civil Procedure section 1021.5.

## COUNT FOUR

(Interference with Contractual Relations)

(By Plaintiff and the Class against All Defendants)

112. Plaintiff realleges and incorporates by reference each of the preceding allegations as though fully set forth hereafter.

113. A valid written contract existed between the Class members including Plaintiff, and third parties. These contracts called for Plaintiff and the Class members to make timely payments.

114. Defendants knew of these contracts.

115. Defendants acted intentionally to induce breach of the contractual relationship, when Defendants advised Plaintiff and the Class members to stop paying their credit card bills and send the money to Defendants instead.

116. In reliance on Defendants' advice, Plaintiff did not make any credit card payments after August 2009 and allowed Defendants to debit the money from her bank account instead.

117. Defendants' acts caused actual breach and disruption of the contractual relationships.

118. As a result of Defendants' acts, Plaintiff and the Class members were damaged.

## COUNT FIVE

(Negligence)

(By Plaintiff and the Class against All Defendants)

119. Plaintiff realleges and incorporates by reference each of the preceding allegations as though fully set forth hereafter.

120. Defendants had a duty under California Financial Code section 12315.1 to notify, in writing, all Plaintiff's and the Class members' creditors of the debtors desire to engage the services of the prorater within five days of the effective date of the contract, and to notify the creditors of the proposed monthly payment to be made to the creditor.

121. Defendants breached that duty by systematically failing to contact Plaintiff's and the Class members' creditors within five days of the effective date of the contract.

122. As a result of Defendants' breach, Plaintiff and the Class members suffered damage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a jury trial and prays for relief as follows:

1) Restitution of all money paid by the Class members to Defendants;
2) Disgorgement of Defendants' profits obtained by the use of the above-described unfair or deceptive acts or practices;
3) An order enjoining Defendants' future use of the above-described unfair or deceptive acts or practices;

FIRST AMENDED CLASS ACTION COMPLAINT     CASE NO. 5:11-CV-03228 HRL

4) Damages according to proof;

5) Punitive damages;

6) An additional award of $5,000 for each class member who is a senior citizen or disabled person as defined in subdivisions (f) and (g) of Civil Code section 1761;

7) An award of attorneys' fees and costs pursuant to 15 U.S.C. section 1679g, Civil Code section 1780, subdivision (e), and Code of Civil Procedure section 1021.5;

8) Costs of suit herein incurred;

9) Interest on all sums awarded at the maximum legal rate as provided by law; and

10) Such other relief as the Court deems proper.

Dated: August 24, 2011         By:    /s/ Tavy A. Dumont
                                      Tavy A. Dumont
                                      LAW OFFICE OF TAVY A. DUMONT
                                      51 E. Campbell Avenue, Suite 106-K
                                      Campbell, California  95008-2054
                                      Telephone: (408) 866-4460
                                      Attorney for Plaintiff and the Proposed Class

## **DEMAND FOR JURY TRIAL**

PLAINTIFF demands a jury trial on issues so triable.

Dated: August 24, 2011         By:    /s/ Tavy A. Dumont
                                      Tavy A. Dumont
                                      LAW OFFICE OF TAVY A. DUMONT
                                      Attorney for Plaintiff and the Proposed Class