**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HEATHER NEWTON,

        Plaintiff,

    v.

AMERICAN DEBT SERVICES, INC., *et al.*,

        Defendants.

_____/

No. C-11-3228 EMC

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR LEAVE TO AMEND**

**(Docket Nos. 142, 143, 167)**

      Plaintiff Heather Newton ("Newton") brings an individual and class action against Defendants American Debt Services ("ADS"), Quality Support Services ("QSS"), Rocky Mountain Bank & Trust ("RMBT"), and Global Client Solutions ("GCS") (collectively "Defendants") for alleged violations of state and federal law regulating debt settlement.  Currently before the Court are (a) RMBT's motion for summary judgment; (b) GCS's motion for summary judgment; and (c) Newton's motion to amend the first amended complaint, filed concurrently with her opposition.

      Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion for summary judgment and **GRANTS** in part and **DENIES** in part Plaintiff's Motion for Leave to Amend.

///

///

///

**United States District Court**
For the Northern District of California

## I. FACTUAL & PROCEDURAL BACKGROUND

The parties have submitted the following evidence in conjunction with the pending summary judgment motions. Where there are disputes of fact, they are so noted. In addition, where there are evidentiary objections in need of a ruling, they are so noted.

Defendants ADS, QSS, GCS, and RMBT collectively provided debt settlement services. ADS is a debt settlement company that advertised its services online to consumers. *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Depo., at pg. 16). Newton found ADS's online webpage, offering debt settlement services. *Id*. In August 2009, Newton signed up online for ADS's services. *See* Docket No. 146-1 (Ex. A to Leonard Decl., at pg. NEWTON_00058). Newton and ADS agreed that ADS would provide "debt settlement and restructure services," which "consist[ed] of negotiating with creditors on behalf of [Newton] for reduction of debt and formulation of a payment plan." *See* Docket No. 146-1 (Ex. A to Leonard Decl., at pg. NEWTON_00054).

As part of this debt settlement enterprise, QSS agreed to provide "customer service functions" and other services to process debt settlements for ADS clients. *See* Docket No. 185 (Ex. 3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00057). "QSS is one of the premier providers of account management and debt settlement services in the United States." *See id*. (Ex. 9 to Kennedy Decl., at ¶ 7). "QSS's particular focus is not upon direct solicitation of clients in need of debt settlement, but rather on providing account management and negotiation support and services as an independent contractor to various other businesses, referred to in the industry as 'Debt Settlement Companies,' or 'DSCs,' that solicit and are ultimately responsible for and to individual clients." *Id*.

GCS agreed to create bank accounts used by ADS clients to "accumulate and disburse funds in connection with the repayment of their debts." *See id*. (Ex. 3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00056). GCS "is a leading provider of account management services to the debt settlement industry today. *See id*. (Ex. 4 to Kennedy Decl.). GCS is a payment processor for consumers who are enrolled in debt settlement programs. *See id*. "[GCS] specialize[s] in providing disbursement accounts that allow consumers to save funds to pay off their debts." *Id*.

RMBT, a Colorado-chartered bank,  agreed to provide custodial bank accounts for "debt settlement companies and their clients," such as ADS and Newton.  *See* Docket No. 185 (Ex. 2 to Kennedy Decl., at pg. RMBT-CONFIDENTIAL-00002, ¶¶ 3.1).

Shortly after signing up, Newton received a Welcome Packet from ADS and/or QSS.  *See* Docket No. 146-2 (Ex. B to Leonard Decl., at pg. NEWTON_00060).  The Welcome Packet contained representations regarding the average debt settlement achieved under the program and how debt settlement will impact the consumer's credit score.  *See* Docket No. 146-2 (Ex. B to Leonard Decl.) ("Welcome Packet," at pg. Newton_00073).  Newton also signed the Special Purpose Account Application ("Account Application") and received the accompanying Account Agreement and Disclosure Statement ("Account Agreement").  *See* Docket No. 163 (Newton Decl. ¶¶ 4, 6).

Newton's Account Application authorized RMBT to create a bank account (the "Account") in connection with debt settlement services.  *See* Docket No. 145-1 (Ex. A to Hampton Decl.); Docket No. 144 (Dotson Decl. ¶ 3).  It also authorized GCS to transfer and disburse funds from Newton's primary checking account to her Account with RMBT.  The Account Application contained a schedule of fees.  *See* Docket No. 163-1 (Ex. A to Newton Decl.).  The following fees were payable to GCS:

|  |  |
|---|---|
| Account Setup (one-time fee) | $5.00 |
| Monthly Service Charge | $8.75 |

*See* Docket No. 145 (Hampton Decl., ¶ 12); Docket No. 145-1 (Account Application).  As part of its duties (*i.e.*, transferring and disbursing of Newton's funds in connection with debt settlement), GCS maintained access to Newton's payment history, including how much defendants charged Newton for debt settlement services.  *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶¶ 1[b], 1[d]).  And, GCS agreed to provide ADS and QSS with access to Newton's account activity (deposits and withdrawals).  *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶ 1[g]).  RMBT had independent access to this information.  *See* Docket No. 185 (Ex. 6 to Kennedy Decl.) (Hampton Depo., at pgs. 24-25).

Once enrolled in the debt settlement program, Newton stopped paying her credit card bills and ceased communications with creditors, per defendants' instruction.  *See* Docket No. 163

**United States District Court**
For the Northern District of California

(Newton Decl. ¶ 7).  In March 2010, Newton received a call from one of her creditors, Bank of America.  *See id*. at ¶ 8.  Bank of America stated she owed $2,200.  *See id*. at ¶ 10.  Newton learned that defendants had not contacted Bank of America.  *See id*. at ¶ 9.  Newton asked defendants to pay Bank of America $1,100 from the Account, and defendants complied.  *See id*. at ¶ 12.

In April 2010, Chase, another creditor, served Newton with summons and complaint in a collection action.  *See id*. at ¶. 14.  Newton subsequently settled the matter alone.  *See id*. at ¶ 18.  Newton also settled with a third creditor (Capital One) alone for an unspecified amount.  *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Depo., at pg. 56).  In June 2010, Newton terminated her account with ADS via certified letter.  *See id*. at ¶ 19.  Ultimately, Newton paid a total of $4,206.50 to defendants, of which $70.04 was refunded to her, $2,200 paid to Bank of America, and the balance of which defendants kept.  *See id*. at ¶ 20.  Records maintained by GCS confirm that Newton was charged $1,936.46 in "Customer Feeds]" and "Transaction Feeds]."  *See* Docket No. 185 (Ex. 1 to Kennedy Decl., at pgs. GLOBAL.R26.00003-GLOBAL.R26.00005).

Newton filed the current action for alleged violations of state and federal consumer protection laws in June 2011.  *See* Docket No. 1.  GCS and RMBT moved for summary.  *See* Docket Nos. 142 and 143.  In her opposition, Newton moved to amend her complaint to "clarify" her theories of liability.  Defendants contend the proposed amendments are intended to circumvent their summary judgment motions.  *See* Docket Nos. 174 (Opp'n to Motion for Leave to Amend, at pg. 8).  Currently before this Court are these three motions: (a) GCS's summary judgment motion (Docket No. 142), (b) RMBT's summary judgment motion (Docket No. 143), and (c) Newton's motion for leave to amend the FAC (Docket No. 167).

## II.  **DISCUSSION**

A.  Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor.  *See id.* at 255.

In the current case, defendants RMBT and GCS have separately moved for summary judgment.  Because Newton has the ultimate burden of proof, RMBT and GCS may prevail on their motions for summary judgment simply by pointing to Newton's failure "to make a showing sufficient to establish the existence of an element essential to [her] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Newton's complaint asserts three claims:  (1) violations of California's Consumer Legal Remedies Act ("CLRA") (C.C.P. § 1750 et seq.); (2) violations of the federal Credit Repair Organization Act ("CROA") (15 U.S.C. § 1679b); and (3) violations of California's Unfair Competition Law (Calif. Bus. & Prof. Code §§ 17200, et seq.), which are predicated upon violations of the CROA, CLRA, and the California Proraters Law.  *See* 15 U.S.C. § 1679(b)(2), (a)(1) (CROA); Cal. Civ. Code § 1770(a)(1), (a)(2), (a)(5), (a)(9), and (a)(1) (CLRA); Calif. Fin. Code §§ 12200, 12314 (California Proraters Law).  Defendants have moved for summary judgment on all three of Newton's claims.  Newton has also moved the Court for leave to amend her complaint to "clarify" her indirect theories of liability.  The Court will first decide defendants' summary judgment motions,[1] and then, the Court will consider whether leave to amend is appropriate.

---

[1] Newton requests that this Court defer ruling on Defendants' pending motions for summary judgment, pursuant to Fed. R. Civ. P. 56(d), so that she may conduct limited discovery on the issue of indirect liability.  *See* Docket No. 186 (Opp'n, at pg. 13) ("Because plaintiff has not had the opportunity to obtain evidence concerning the issue of agency, the court should, if it does not deny the motion outright, defer this motion until plaintiffs have had such opportunity.").  A party seeking postponement must "show how additional discovery would preclude summary judgment and why [it] cannot immediately provide 'specific facts' demonstrating a genuine issue of material fact."  *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 966 (9th Cir. 2009)(quoting *Mackey v. Pioneer Nat. Bank*, 867 F.2d 520, 524 (9th Cir. 1989)).  A district court may deny postponement if the moving party fails to make this showing.  *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986) (affirming denial of postponement, in part, because mere "[r]eferences in memoranda and declarations to a need for discovery do not qualify" as such a showing).  Because Newton has failed to make this showing, the Court denies her request for postponement.

**United States District Court**
For the Northern District of California

B.      Indirect Liability

The Court finds that the main issue on summary judgment is whether defendants can be held liable via indirect theories of liability – civil conspiracy and aiding-and-abetting.  RMBT and GCS contend they are either exempt or no evidence exists to support direct liability.  For the reasons stated below, RMBT and GCS may not be held directly liable.  The Court also finds that neither RMBT nor GCS may be held indirectly liable for CROA or CLRA claims.

1.      Civil Conspiracy

Civil conspiracy is not a cause of action, but a doctrine that imposes liability upon coconspirators, even though they did not commit the tort themselves.  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 510-11 (1994).  A coconspirator's participation in a conspiracy imposes coequal tort liability with the immediate tortfeasors.  *Id.* at 511.  Thus, the primary significance of finding a conspiracy is that each participant is responsible for all ensuing harm irrespective of whether or not each was the direct actor and regardless of each's degree of activity.  *See AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 952 (N.D. Cal. 2003) (citing *Mox, Inc. v. Woods*, 202 Cal. 675, 677-78 [1927]).  A party alleging the existence of a civil conspiracy must establish:

> (1) ***formation*** and ***operation*** of the conspiracy;
>
> (2) ***wrongful act or acts*** done pursuant thereto; and
>
> (3) the ***damage*** resulting.

*See Applied Equip.*, 7 Cal.4th at 511 (emphasis added).  As to formation, a plaintiff must show agreement among coconspirators to a common plan or design to commit a tortious act.  *See Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995).  The coconspirators must also have *actual knowledge* of the planned tort and intent *to aid* in its commission.  *Id.*

A plaintiff's failure to use the terms "conspiracy" or "conspire," is not fatal to an allegation of civil conspiracy.  *See P. Tel. and Tel. Co. v. MCI Telecomm. Corp.*, 649 F.2d 1315, 1319 (9th Cir. 1981) (citing *Kramer v. Ferguson*, 230 Cal. App. 2d 237, 247, n.1 [1964]).  Moreover, even if written agreements between the defendants do not clearly indicate an intent to conspire, concurrence

**United States District Court**
For the Northern District of California

need not be explicit. Tacit concurrence is sufficient. *See Schwartz v. Pillsbury Inc.*, 969 F.2d 840, 844 (9th Cir. 1992) ("Tacit consent is enough to prove conspiracy").

       2.    <u>Aiding-and-Abetting</u>

      Similarly, under an aiding-and-abetting theory, those who provide substantial assistance with actual knowledge of the wrongdoing are liable as co-tortfeasors for the wrongs committed by co-defendants. Unlike civil conspiracy, aiding-and-abetting does not require proof of an agreement to commit the primary wrong. *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d 1101, 1134 (C.D. Cal. 2003) (citing *Halberstam v. Welch*, 705 F.2d 472, 478 (D.C. Cir. 1983)). Accordingly, a party alleging aiding-and-abetting need only establish:

        (1) defendant's **actual knowledge** of the specific primary wrong, and

        (2) defendant's **substantial assistance** in its commission.

*Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (2005).

      The salient issue shared by these two indirectly theories of liability is whether defendants possessed the requisite *knowledge* of the co-tortfeasor's wrongdoing for liability to attach for the alleged statutory violations of the CROA and CLRA.

C.    <u>CROA</u>

      Congress enacted the Credit Repair Organizations Act ("CROA"), in part "to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2). Newton asserts two bases for liability under CROA — subdivisions (a)(1) and (b) of § 1679b:[2]

        (a) In general

           No person may –

        (1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading . . . with respect to any consumer's credit worthiness, credit standing, or credit capacity to –

        (A) any consumer reporting agency (as defined in section 1681a(f) of this title); or

        (B) any person –

---

[2] *See* Docket No. 11 (FAC, ¶¶ 87, 88).

**United States District Court**
For the Northern District of California

(i) who has extended credit to the consumer; or

(ii) to whom the consumer has applied or is applying for an extension of credit . . .

(b) Payment in advance

No credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed.

15 U.S.C. § 1679b.

Newton's claim under subdivision (a)(1) fails because she has produced no evidence that *any* defendants made untrue or misleading representations to the relevant parties described in subdivision (a)(1)(A) and (B). Newton merely alleges that the untrue or misleading representation is found in the Welcome Packet she received from defendants:

**17.      Will this program have a negative effect on my credit?**

The Debt Settlement Program may have a short-term negative effect on your credit profile. When a delinquent account is settled this is reflected on your credit report. A settled account is better than an unresolved delinquent account. Your credit score should improve after successfully completing our program. Since these debts are paid, your debt-to-income ratio should improve. Debt to income ratios are not part of your credit score. However, they are an important measurement by which lenders evaluate applicants for auto and home loans. ***Once negotiated and settled, your creditors will report the accounts as "settled as agreed" or "balance 0".***

*See* Docket No. 146-2 (Ex. B to Leonard Decl.) ("Welcome Packet," at pg. Newton_00075) (emphasis added). Newton offers no evidence that GCS or RMBT made any representations to credit bureaus, creditors, or potential creditors as requested by subdivision (a)(1). A representation to her or other consumers is simply not actionable under subdivision (a)(1). *See e.g.*, *Zimmerman v. Logemann*, No. 09-CV-210 (SLC), 2009 WL 4407205, at *6 (W.D. Wis. 2009) (finding subdivision (a)(1) "does not cover statements *to the consumer* but only statements *to creditors* [or potential creditors].") (emphasis in original). This interpretation is confirmed by the plain language of subdivision (a)(1) set forth above. Thus, Newton's claim for direct liability under subdivision (a)(1) fails as to both GCS and RMBT.

1    Newton's claim under subdivision (b) is also meritless.  Subdivision (b) governs "credit

2  repair organizations."  RMBT and GCS do not fit the definition of "credit repair organization,"

3  which excludes banks and includes persons providing certain services:

4        "The term 'credit repair organization' –

5            (A) means any person who uses any instrumentality of
             interstate commerce or the mails to sell, provide, or perform

6            (or represent that such person can or will sell, provide, or
             perform) any service, in return for the payment of money or

7            other valuable consideration, for the express or implied
             purpose of –

8

9                (i) improving any consumer's credit record, credit
                 history, or credit rating; or

10                (ii) providing advice or assistance to any consumer
                 with regard to any activity or service described in

11                 clause (i); and

12            (B) does not include –

13            [ . . . ]

14                (iii) any depository institution (as that term is defined in
                 section 1813 of Title 12) or any Federal or State credit

15                 union (as those terms are defined in section 1752 of
                 Title 12), or any affiliate or subsidiary of such a

16                 depository institution or credit union."

17  15 U.S.C. § 1679a.  "Depository institution" means "any bank or savings association," including

18  state banks.  *See* 12 U.S.C. § 1813(a)(1)(A), (c)(1).  As a Colorado-chartered bank, RMBT thus falls

19  squarely within the definition of a depository institution.

20    GCS does not fall within the definition of a credit repair organization.  The service GCS

21  provided Newton consisted of "iniat[ing] debit and credit entries" to her custodial account, which

22  RMBT managed, and providing customer service for that account.  Newton fails to show how the

23  express or implied purpose of this discrete service is to improve her "credit record, credit history, or

24  credit rating."  Newton simply cites no evidence that GCS or RMBT offered or provided credit

25  repair services.  Accordingly, neither GCS nor RMBT can be held directly liable under subdivision

26  (b) of CROA because Newton offers no evidence:  (1) that RMBT is not exempt, or (2) that GCS is

27  a credit report organization.

28

**United States District Court**
For the Northern District of California

1    Notwithstanding the lack of direct liability under CROA, the issue remains whether GCS or

2    RMBT may be held indirectly liable under CROA.  As a threshold matter, Newton offer no authority

3    demonstrating that CROA allows liability to attach secondarily.  The Supreme Court has held that

4    there is no general presumption of aider-and-abettor liability for federal statutory violations.  *Cent.*

5    *Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (noting that

6    where a statute provides a private right of action there is "no general presumption that the plaintiff

7    may also sue aiders and abettors.").  Additionally, "[w]here as here, the statutory sections are clear

8    about upon whom they are imposing liability and there are no unreasonable or impracticable

9    results," courts are reluctant to substitute their own judgement for that of Congress' expressed will.

10   *Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006) (refusing to infer secondary liability

11   – *i.e.*, civil conspiracy or aider-and-abettor liability – for alleged violations of the Electronic

12   Communications Privacy Act, a federal statute).  That Congress enacted CROA to regulate the

13   activities of "credit repair organizations" is clear on its face:

14              The **purposes** of this subchapter are –

15              (1) to ensure that prospective buyers of the services of **credit repair**
                **organizations** are provided with the information necessary to make an

16              informed decision regarding the purchase of such services; and

17              (2) to protect the public from unfair or deceptive advertising and
                business practices by **credit repair organizations**.

18

19   15 U.S.C. § 1679(a)(1) (emphasis added).  And, while some of CROA's language evinces an intent

20   to regulate more broadly the activities of "persons," this term is further limited to those "persons"

21   who make or advise the making of false or misleading statements regarding a consumer's

22   creditworthiness, the bailiwick of credit repair organizations.  Thus, because the CROA's regulatory

23   focus is somewhat circumscribed, Newton's failure to offer any basis to extend indirect liability for

24   alleged violations of its provisions is particularly wanting.

25              Even assuming CROA is amenable to indirect liability, the fundamental issue remains

26   whether any other defendants can be considered a credit repair organization.  To determine whether

27   an entity is a credit repair organization, a court should focus on defendants' conduct and the nature

28   of their enterprise.  *Helms v. Consumerinfo.com, Inc.*, 436 F. Supp. 2d 1220, 1231 (N.D. Ala. 2005)

1   ("In determining whether Defendant is a credit repair organization, the Court need not limit itself to

2   only those webpages or statements which Plaintiff specifically recalls seeing. Rather, the Court may

3   look to the entire nature of Defendant's business and the representations that it makes in order to

4   arrive at a conclusion.  *See generally* §§ 1679a-1679g." ).  While Newton does not allege, for

5   example, that any defendant contacted credit bureaus on her behalf or counseled her on how to

6   improve her credit, this is not dispositive because an alleged credit repair organization need only

7   represent that it would do so.  *See Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 752 (N.D. Ill. 2011)

8   (finding plaintiff need not allege defendant actually attempted to repair a consumer's credit record; a

9   representation that it would do so is sufficient).

10          It is questionable whether the remaining defendants provided credit repair services.  ADS

11   and/or QSS made oblique credit-related representations of the indirect benefits of their debt

12   settlement program to consumers, *see* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Depo., at

13   pg. 22) ("I was told my credit would be hindered while I was in the program, but then...as soon as I

14   was done with the program it would go right back up."); Docket No. 146-2 (Ex. B to Leonard Decl.)

15   ("Welcome Packet," at pg. Newton_00075) ("Once negotiated and settled, your creditors will report

16   the accounts as 'settled as agreed' or 'balance 0.'").  Yet, this does not change the primary aim of

17   their enterprise, debt settlement services.

18          In any event, even assuming Newton clears this hurdle, Newton has failed to meet a critical

19   element to both theories of indirect liability – *i.e.*, knowledge.  *Kidron*, 40 Cal. App. 4th at 1582

20   (conspiracy requires knowledge of the planned tort); *Casey*, 127 Cal. App. 4th at 1145 (aider-and-

21   abettor liability requires knowledge of the specific primary wrong).  Significantly, Newton has failed

22   to produce any evidence that GCS and RMBT were aware of any misrepresentations made by ADS

23   and/or QSS.  Thus, Newton's theories of holding GCS and RMBT indirectly liable for violations of

24   CROA also fail as a matter of law.

25   D.     <u>CLRA</u>

26          The Consumer Legal Remedies Act ("CLRA") proscribes certain unfair or deceptive

27   methods, acts or practices.  *See* Cal. Civ. Code § 1770(a)(1), (a)(2), (a)(5), (a)(9), and (a)(1).  The

28   statute's purpose is "to protect consumers against unfair and deceptive business practices and to

provide efficient and economical procedures to secure such protection." *Id.* at § 1770.  The CLRA's

breadth is greater than CROA in that its reach is not confined, *e.g.*, to the practices of credit repair

organizations.

        Newton alleges GCS and RMBT violated the following provisions of the CLRA:

> (a) The following unfair methods of competition and unfair or
> deceptive acts or practices undertaken by any person in a transaction
> intended to result or which results in the sale or lease of goods or
> services to any consumer are unlawful:
>
> > (1) Passing off goods or services as those of another.
> >
> > (2) Misrepresenting the source, sponsorship, approval,
> > or certification of goods or services.
> >
> > (5) Representing that goods or services have
> > sponsorship, approval, characteristics, ingredients, uses,
> > benefits, or quantities which they do not have or that a
> > person has a sponsorship, approval, status, affiliation,
> > or connection which he or she does not have.
> >
> > (9) Advertising goods or services with intent not to sell
> > them as advertised.
> >
> > (14) Representing that a transaction confers or involves
> > rights, remedies, or obligations which it does not have
> > or involve, or which are prohibited by law.

*See* Docket No. 11 (FAC, ¶ 71 et seq.) (citing Cal. Civ. Code § 1770(a)(1), (a)(2), (a)(5), (a)(9), and

(a)(14)).  Newton also identifies specific facts describing defendants' alleged misrepresentations:

> - (a)(1) and (a)(2): "By representing that services would be
>   performed by . . . ADS . . . , when the company actually
>   interacting with Plaintiff and the Class members was QSS."
>   *See* Docket No. 11 (FAC, at ¶ 74).
>
> - (a)(5) and (a)(9): "By representing that they settle debt at an
>   average 40% to 60% on the dollar . . . ," *see id.* at ¶¶ 76-77,
>   and "By representing that clients' credit should be improved as
>   a result of the services . . . ," *see id.* at ¶ 78.
>
> - (a)(14): "By representing that Plaintiff and the Class members
>   are obligated to pay a fee equal to 15% of the debt enrolled in
>   the program, collected in advance,..." *see id.* at ¶ 79.

Newton has offered no evidence that GCS or RMBT made any representations to her or other

consumers.  Thus, GCS and RMBT are entitled to summary judgment unless Newton can show

some other basis for liability.

United States District Court

For the Northern District of California

As a threshold matter, as noted above in the context of CROA, Newton has identified no authority (or otherwise analyzed the statute) to show that the CLRA permits indirect liability.  At least one federal court has expressed doubt the CLRA is amenable to indirect liability.  *See In re Jamster Mktg. Litig.*, MDL1751, No. 05-CV-0819 (JM-CAB), 2009 WL 1456632, at *9 (S.D. Cal. May 22, 2009) ("Plaintiffs fail to identify any authority permitting a CLRA claim to be maintained under a secondary liability theory.  Consequently, the court grants the motion to dismiss the CLRA and FAL claims.").  The Court nevertheless interprets the CLRA as permitting indirect liability.  First, although the statute does not expressly provide for indirectly liability, the CLRA seeks to regulate broadly the activities of "any person":

> "The following unfair methods of competition and unfair or deceptive acts or practices undertaken by ***any person*** in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

Cal. Civ. Code § 1770(a)(1) (emphasis added).  A "person" is defined broader still to include "an individual, partnership, corporation, limited liability company, association, or other group, however organized."  Calif. Civ. Code § 1761(c).  Second, the CLRA contains a sweeping directive to construe its provisions liberally:

> "This title shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection."

*Id*. at § 1760.  Interpreting the CLRA to permit indirect liability would afford consumers with greater protection from "unfair and deceptive business practices."  Denying relief under indirect theories of liability threatens the effectuating of its statutory purpose.  Accordingly, this Court assumes for purposes of this motion that the CLRA allows for indirect liability.

However, as to conspiracy, Newton has failed to adduce direct evidence that GCS and RMBT possessed the requisite knowledge and intent to have conspired to violate the CLRA.  Mere knowledge or approval of an intended wrongful act is insufficient; a coconspirator must agree – explicitly or tacitly – to achieve it.  *See Choate v. Cnty. of Orange*, 86 Cal. App. 4th 312, 333 (2000).  Here, the wrongful act is the making of misrepresentations which constitute "unfair or

United States District Court

For the Northern District of California

deceptive acts or practices" under the CLRA.  In sum, Newton offers no direct evidence that GCS or RMBT had any role (or were even aware of) in making or agreeing with ADS and QSS to make misrepresentations to Newton and other consumers.

Similarly, the available circumstantial evidence does not permit a reasonable inference that GCS and RMBT conspired with ADS and QSS to violate its provisions.  When a plaintiff presents only circumstantial evidence, the inferences arising therefrom must be sufficient to sustain a verdict; otherwise, summary judgment is proper.  *See Klamath-Lake Pharm. Ass'n v. Klamath Med. Serv. Bureau*, 701 F.2d 1276, 1291 (9th Cir. 1983) ("Although conspiracy sufficient to survive summary judgment may be inferred from circumstantial evidence, the plaintiff must come forward with 'significant probative evidence' that supports its conclusion."); *Kidron*, 40 Cal. App. 4th at 1582 (knowledge of wrongdoing inferred from "the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances."); *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (conspiracy "may be inferred on the basis of circumstantial evidence such as the actions of the defendants"); *In re High-Tech Empl. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1116 (N.D. Cal. 2012) ("[I]t is plausible to infer that the overlapping board membership here provided the opportunity to conspire and an opportunity for transfer of the requisite knowledge and intent regarding the [anticompetitive] bilateral agreements.").  But an inference from circumstantial evidence must flow logically from other facts established in the action. *Kidron*, 40 Cal. App. 4th at 1582.  A mere association, for example, does not make a conspiracy.  *Id.* Conspiracies cannot be established from mere suspicions.  *Id.*  Accordingly, to infer a conspiracy, courts consider circumstantial factors such as (1) the nature of the alleged coconspirator's actions, (2) their relation to one another, (3) their interests in the conspiracy, (4) the opportunity to conspire, (5) the opportunity to transfer the requisite knowledge and intent, and (6) other circumstances.

The circumstantial evidence does not support an inference that GCS and RMBT conspired to make misrepresentations to Newton, in violation of the CLRA. Defendants entered into agreements to form a single debt settlement enterprise.  As part of this debt settlement scheme, Newton's funds were deposited into custodial accounts created and maintained by RMBT, a Colorado-chartered bank.  GCS initiated electronic transfers to and from these accounts for debt settlement purposes.

1   ADS and/or QSS were responsible for the marketing of debt settlement services, negotiating with

2   creditors, and providing consumers with customer service. *See* Docket No. 185 (Ex. 3 to Kennedy

3   Decl., at pg. GLOBAL-CONFIDENTIAL-00057); Docket No. 146-1 (Ex. A to Leonard Decl., at pg.

4   NEWTON_00054).  But the foregoing evidence is also consistent with the conclusion that GCS and

5   RMBT were part of a legitimate debt settlement enterprise.  GCS and RMBT were aware they were

6   part of a debt settlement enterprise, as they procured a waiver requiring every consumer to

7   acknowledge that they took no part in settling their debts:

8   　　　　"Neither [GCS] nor [RMBT] is a party to your debt settlement plan,
        　　　　and they do not participate in the negotiation of your debts.
9   　　　　**Accordingly, you hereby expressly acknowledge that neither
        　　　　[GCS] or [RMBT] have any involvement in or responsibilities with
10  　　　　respect to your debt settlement plan or the results that you may or
        　　　　may not achieve from its execution.**"

11

12  *See* Docket No. 145-2 (Ex. B to Hampton Decl.) (Welcome Letter, at pg. 4) (emphasis in original).

13  And, although both GCS and RMBT were the subject of enforcement actions with respect to other

14  matters (*see* n. 3, *infra*), this only provided them with general notice of consumer protection laws,

15  none of which involved violations of or in any way reference the CLRA.  *See generally* Docket No.

16  164-1 (Ex. 1 to Plf.'s RJN) (FDIC consent order); Docket No. 164-1 (Ex. 2 to Plf.'s RJN)

17  (California Department of Corporations cease-and-refrain order).[3]  More significantly, Newton

18  presents no circumstantial evidence to infer that GCS and RMBT were aware of the

19  misrepresentations made by *ADS and/or QSS* that allegedly violated the CLRA.  Thus, Newton has

20

21

22  ────────────────

23  　　　[3] The Court grants Newton's request for judicial notice of the FDIC consent order and the
    Department of Corporations cease-and-refrain order.  Though a court may not take note of a
    document's contents, it is permissible to consider public records as evidence that defendants were on
24  inquiry notice.  *See Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th
    Cir. 2010) (court may take notice of periodicals to "indicate what was in the public realm at the
25  time"); *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981, n. 18 (9th Cir. 1999) (granting
    judicial notice of articles which show "that the market was aware of the information contained in
26  news articles submitted by the defendants"); *Anschutz Corp. v. Merrill Lynch and Co. Inc.*, 785 F.
    Supp. 2d 799, 809 (N.D. Cal. 2011), *motion to certify appeal denied* in No. 09-CV-03780 (SI), 2011
27  WL 2160888 (N.D. Cal. 2011) (taking judicial notice of SEC filings, including a cease-and-desist
    order); *Mangini v. R. J. Reynolds Tobacco Co.*, 7 Cal.4th 1057, 1063 (1994) *overruled on other
28  grounds by In re Tobacco Cases II*, 41 Cal.4th 1257 (2007) (courts may take judicial notice of
    official acts and public records but for the truth of facts stated therein).

1    failed to adduce sufficient evidence, circumstantial or otherwise, tending to show that GCS and

2    RMBT conspired with ADS and QSS to commit violations of the CLRA.

3         Furthermore, because actual knowledge of the specific violation at issue, *i.e.*

4    misrepresentations, is also necessary for aiding-and-abetting liability to obtain, Newton's contention

5    of aiding-and-abetting liability also fails as there is no evidence GCS and RMBT had such

6    knowledge. *See Casey*, 127 Cal. App. 4th at 1145 (aiding-and-abetting liability requires "actual

7    knowledge of the specific primary wrong"). Accordingly, Newton has failed to produce evidence of

8    a genuine issue of whether GCS or RMBT are indirectly liable for violations of the CLRA.

9    E.    California's Proraters Law

10        California's Financial Code regulates the activities of "Check Sellers, Bill Payers, and

11   Proraters." *See* Calif. Fin. Code § 12000 et seq. ("Proraters Law"). In relevant part, the Proraters

12   Law is a consumer protection statute that regulates the activities of "proraters," who provide debt

13   management services. The statute defines proraters as follows:

> "A prorater is a person who, for compensation, engages in whole or in
> part, in the business of receiving money or evidences thereof for the
> purpose of distributing the money or evidences thereof among
> creditors in payment or partial payment of the obligations of the
> debtor."

17   Calif. Fin. Code § 12002.1. In general, the Proraters Law requires the licensure of proraters and

18   grants authority to the Commissioner[4] to (a) issue cease-and-refrain orders, and (b) initiate

19   enforcement actions for violations of its provisions.

20        The Proraters Law appears to provide no private right of action. *See* Calif. Code §§ 12103

21   (Desist order; rescission) ("the ***commissioner*** may order the person or licensee to desist and refrain

22   from...violating this division"); 12105 (Enforcement action brought by the commissioner; injunctive

23   relief and ancillary relief; civil penalties; costs and attorneys fees) ("the ***commissioner*** may, at his or

24   her discretion, bring an action in the name of the people...of California...to enforce compliance.")

25   (emphasis added). Newton accordingly cannot directly enforce its provisions. Rather, alleged

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28        [4] The "Commissioner" is the Commissioner of California's Department of Financial
     Institutions. *See* Calif. Fin. Code § 99.

**United States District Court**
For the Northern District of California

1  violations of the Proraters Law are predicate violations underlying Newton's UCL claim. *See*

2  Docket No. 11 (FAC, ¶¶ 104-106).

3      Newton contends summary judgment should be denied because, even without amending her

4  FAC, there are sufficient facts in the record to hold defendants indirectly liable for two violations of

5  the Proraters Law: (1) failure to procure a license; and (2) exceeding maximum fee charges.

6      The Proraters Law requires the licensure of proraters:

7         "No person shall engage in the business, for compensation, of selling
       checks, drafts, money orders, or other commercial paper serving the

8         same purpose, or of receiving money as agent of an obligor for the
       purpose of paying bills, invoices, or accounts of such obligor, or

9         acting as a prorater, nor shall any person, without direct compensation
       and not as an authorized agent for a utility company, accept money for

10         the purpose of forwarding it to others in payment of utility bills,
       ***without first obtaining a license*** from the commissioner."

11

12  Calif. Fin. Code § 12200 (emphasis added). A "prorater" is "a person who, for compensation,

13  engages in whole or in part in the business of receiving money or evidences thereof for the purpose

14  of distributing the money or evidences thereof among creditors in payment or partial payment of the

15  obligations of the debtor." *Id*. at § 12002.1. Accordingly, as to a violation of the licensure

16  provision, Newton may defeat summary judgment by producing evidence that RMBT or GCS (a) is

17  in the business of receiving money, (b) for compensation, (c) for the purpose of distributing money,

18  (d) among creditors, (e) in payment or partial payment of the debtor's obligations, (f) without a

19  license. Newton further contends that liability will attach to those who conspired or aided-and-

20  abetted any defendant do so the same.

21      Additionally, the Proraters Law mandates a ceiling above which proraters cannot charge

22  consumers:

23         "The total charges received by a prorater, or any other person for the
       prorater's services, may not exceed in the aggregate twelve percent

24         (12%) for the first three thousand dollars ($3,000), eleven percent
       (11%) for the next two thousand dollars ($2,000), and ten percent

25         (10%) for any of the remaining payments distributed by a prorater to
       the creditors of a debtor, except for payments made on recurrent

26         obligations."

27  Calif. Fin. Code § 12314. Here, Newton must produce evidence that RMBT or GCS charged her

28  more than 12% for the first $3,000 distributed to her creditors. Newton similarly contends that

1    liability under this provision will attach to those who conspired or aided-and-abetted any defendant

2    to so charge her or any other consumer.

3         1.    Exemption

4         As a threshold matter, RMBT is exempt.  The Proraters Law expressly exempts banks:

5              "This division does not apply to any of the following:

6              (a) Any person, or his or her authorized agent, doing business under
               license and authority of the Commissioner of Financial Institutions
7              under Division 1 (commencing with Section 99) or under any law of
               this state or of the United States relating to banks, trust companies,
8              building or savings associations, industrial loan companies, personal
               property brokers, credit unions, title insurance companies or
9              underwritten title companies, as defined in Section 12402 of the
               Insurance Code, escrow agents subject to Division 6 (commencing
10             with Section 17000), or finance lenders subject to Division 9
               (commencing with Section 22000)."

11

12   Calif. Fin. Code § 12100.  Newton nonetheless contends that RMBT may still be liable indirectly.

13   RMBT argues that the exemption is "absolute" and shields banks from indirect as well as direct

14   liability.  Inasmuch as RMBT is contending the exemption vitiates liability for conspiracy, the

15   argument is well taken.  Conspiracy is not an independent tort, but instead, only allows liability

16   against "a party who already owes the duty and is not immune from liability based on applicable

17   substantive tort law principles."  *Applied Equip. Corp.*, 7 Cal.4th at 514.  Because of the exemption

18   for banks, RMBT owes no duty under the Proraters Law.  By contrast, aider-and-abettor liability has

19   no such independent legal duty requirement.  *Neilson v. Union Bank of Calif., N.A.*, 290 F. Supp. 2d

20   1101, 1127 (C.D. Cal. 2003) (finding aiding-and-abetting breach of fiduciary duty "does not require

21   that the aider and abettor owe plaintiff a duty so long as it knows the primary wrongdoer's conduct

22   constitutes a breach of duty, and it substantially assists that breach of duty.") (citing *Fiol v.

23   Doellstedt*, 50 Cal. App. 4th 1318, 1325–26 (1997)).  Accordingly, the exemption does not

24   immunize RMBT from aiding-and-abetting a violation of the Proraters Law.  *Estrella v. Freedom

25   Fin. Network, LLC*, No. 09-CV-03156 (SI), 2010 WL 2231790, at *6, fn.7 (June 2, 2010) (rejecting

26   argument that exemption for banks would immunize defendant against liability for "aid[ing] non-

27   banks in violating the [Proraters Law]" ).  Thus, RMBT can only be indirectly liable for aiding and

28   abetting violation of the Proraters Law.

GCS contends it is exempt as an "authorized agent" of RMBT within the meaning of the Proraters Law's exemptions. *See* Calif. Fin. Code § 12100(a) ("This division does not apply to any of the following: (a) Any person, or his or her authorized agent, doing business. . .relating to banks. . . ."). This argument is problematic. Newton has identified evidence of the parties' contractual relationship that creates a genuine issue of whether GCS was RMBT's "authorized agent" within the meaning of the Proraters Law. Under paragraph 4.4 of the defendants' "Bank Agreement," GCS and RMBT agreed to indemnify each other:

> 4.4    Relationship and Indemnification . . . . Accordingly, absent any fault of the other party, [GCS] and [RMBT] each hereby indemnifies the other, as well as the other's principals, directors, managers, officers, employees and agents, and ***shall defend and hold all indemnified parties harmless from and against any and all liabilities, suits, other legal actions, demands, damages, costs and expenses of any kind or nature***, including , without limitation, reasonable legal fees and associated expenses, relating to the failure of the indemnifying party to observe or perform its obligations under this Agreement and otherwise with respect to the conduct of the indemnifying party's business or affairs.

*See* Docket No. 185 (Ex. 2 to Kennedy Decl.). Notably, California's Attorney General found a similar "agency agreement" antithetical to a finding of agency:

> "SELLER hereby agrees to hold harmless BANK from and against any and all liability and damages of any nature incurred by reason of said stop payment."

41 Ops. Cal. Atty. Gen. 169, 173; 1963 Cal. AG LEXIS 108, at *10. On this basis, the California Attorney General found that "such an agreement does not create the type of agency contemplated by section 12100 and for that reason the agent under such an agreement would be not be exempted from the licensing requirements of the Check Sellers and Cashers Law," an earlier version of the Proraters Law. *Id.* Accordingly, GCS cannot rely on paragraph 4.4 to establish it is as an "authorized agent" of RMBT within the meaning of § 12100(a).

Further, GCS has failed to adduce evidence to satisfy the elements of agency. The existence of agency is ordinarily a question of fact, except where the evidence is susceptible to one inference, *i.e.* absence of agency, in which case no triable issue is presented. *In re McRoyal*, 869 F.2d 1497 (9th Cir. 1989) (citing *Desuza v. Andersack*, 63 Cal. App. 3d 694, 700 (1976)). GCS bears the

United States District Court

For the Northern District of California

1  burden of showing it was the "authorized agent" of RMBT.  Calif. Fin. Code § 12101.5 ("In any

2  proceeding under this law, the burden of proving an exemption or an exception from a definition is

3  upon the person claiming it.").  "An agent is one who represents another, called the principal, in

4  dealings with third persons."  Calif. Civ. Code § 2295 (1872).  GCS and RMBT agreed to an

5  independent contractor relationship, see Docket No. 185 (Ex. 2 to Opp'n, at pg. RMBT-

6  CONFIDENTIAL-000024) ("The relationship of the parties created under this Agreement is that of

7  *independent contractors*, and no partnership, joint venture or similar relationship is intended to be,

8  nor is, created as a result of the execution or performance hereof.") (emphasis added), which is

9  insufficient to create an agency relationship.  *U.S. v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010)

10  ("Unlike employees, independent contractors are not ordinarily agents.").  However, an independent

11  contractor may be an agent in limited circumstances where he acts "subject to the principal's overall

12  control and direction."  But GCS has offered no evidence that RMBT exercised control or

13  supervision.  *See e.g.*, *Van't Rood v. Cnty. of Santa Clara*, 113 Cal. App. 4th 549, 572 (2003)

14  (finding control to be "the essential characteristic" the absence of which "there is no true agency").

15      GCS contends that it is the ostensible agent of RMBT based on a statement in the

16  Application Agreement to that effect.  *See* Docket No. 177 (Reply, at pg. 5-6) ("[T]here was clearly

17  an ostensible agency relationship"; "I hereby authorize [RMBT] through *its agent* [GCS], to initiate

18  . . .").  (emphasis added).  Even so, GCS's agency was limited to generating business, which did not

19  extend to responsibilities "relating to banks."  *See* Calif. Fin. Code § 12100 (exemption extends to

20  banks and their "authorized agent, doing business. . . *relating to banks*.") (emphasis added).  In fact,

21  under its agreement with RMBT, GCS had only one responsibility: "promote and market its services

22  to debt management companies and their clients, thereby creating the need for Accounts and

23  generating the associated deposits for [RMBT]."  *See* Docket No. 185 (Ex. 2 to Opp'n, at pg.

24  RMBT-CONFIDENTIAL-00002).  By contrast, RMBT's chief responsibility was to "provide Bank

25  Services," which is defined as "providing Accounts, the Aggregate Account and the Ancillary

26  Accounts and all related banking services. . . ."  By the plain terms of their agreement, GCS was

27  RMBT's agent for the limited purpose of generating business with debt settlement companies and

28

United States District Court

For the Northern District of California

1    their clients.  Thus, the exemption under the Proraters Law that protects a bank's "authorized agent"

2    arguably does not extend to GCS.  Accordingly, GCS enjoys no immunity under the Proraters Law.

3            2.      Liability of GCS and RMBT Under Proraters Law

4            With respect to the licensing provision of the Proraters Law, the California Department of

5    Corporations targeted GCS, along with others, for its involvement with another debt settlement

6    company (FDR) allegedly engaged in prorating without a license.  *See* Docket No. 164 (Ex. 2 to

7    RJN, at pg. 5, ¶ 23).  Thus, GCS was on notice that the Proraters Law proscribes prorating without a

8    license.  There is no evidence that ADS or QSS possessed a proraters license.  Because the lack of a

9    license is a matter of public record, and given the contractual relationship between the parties in this

10   endeavor, it is reasonable to infer GCS and RMBT had knowledge of the licensure provision of the

11   Proraters Law was violated by ADS and QSS.  Accordingly, there is sufficient evidence to support

12   an inference of conspiracy on the part of GCS (but not RMBT for the reasons stated above); there is

13   also sufficient evidence to infer that both GCS and RMBT aided and abetted violations of the

14   licensing provision.  *See Casey*, 127 Cal. App. 4th at 1145 (aider-and-abettor liability requires

15   knowledge of the specific primary wrong).

16           Similarly, there is sufficient basis to infer GCS formed an agreement with ADS and QSS to

17   conspire to violate the Proraters Law's maximum charge provision.  As noted above, proraters —

18   those who receive money to distribute money among creditors in payment of debt — are prohibited

19   from charging consumers in excess of 12% for the first $3,000 prorated.  *See* Calif. Fin. Code §

20   12314.  ADS and QSS charged Newton in excess of the Proraters Law's maximum charge provision.

21   Furthermore, there is evidence that GCS and RMBT were aware that ADS and QSS had charged

22   Newton more than the 12% limit for the first $3,000 of her money they prorated.  GCS maintained

23   Newton's account activity, including the debt settlement fees charged against that account.  An

24   account statement produced by GCS indicates that defendants charged Newton 88% of the first three

25   thousand dollars disbursed to her creditors, which is well in excess of the 1

26   2% limit.  All defendants, including RMBT, had access to this information.  *See* Docket No. 185

27   (Ex. 6 to Kennedy Decl.) (Hampton Depo., at pgs. 24-25); Docket No. 185 (Ex. 3 to Kennedy Decl.,

28   ¶ 1[g]).  *See Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir.

United States District Court

For the Northern District of California

1   1987) (noting that even where basic facts are undisputed, if reasonable minds could differ on the

2   inferences to be drawn from those facts, summary judgment should be denied).

3          The record also supports an inference that defendants provided ADS and QSS with

4   substantial assistance.  Substantial assistance requires that a defendant's actions were a "substantial

5   factor" in causing plaintiff's injury.  *See Neilson v. Union Bank of California*, 290 F. Supp. 2d 1101,

6   1118 (C.D. Cal. 2003).  "[O]rdinary business transactions" can constitute substantial assistance.  *See*

7   *Casey*, 127 Cal. App. 4th at 1145; *see also Benson v. JPMorgan Chase Bank, N.A.*, Nos. 09-CV-

8   5272 and 09-CV-5560 (EMC), 2010 WL 1526394, at *5 (N.D. Cal. April 15, 2010) (unpublished

9   disposition) (provision of "essential banking services that allowed Ponzi scheme to continue over a

10  period of time" constituted substantial assistance).  Here, there is evidence that GCS and RMBT

11  provided substantial assistance, as they arguably were critical to the debt settlement enterprise.  As

12  noted above, ADS and QSS could not offer debt settlement services without custodial bank accounts

13  and the administration of those accounts, services provided by their close business partners, GCS

14  and RMBT.  Significantly, there is evidence that GCS and RMBT had experience in this area and

15  understood their role in the debt settlement enterprise; and their knowledge of the wrongdoing by

16  ADS and QSS in violating the Proraters Law at issue can reasonably be inferred.  Accordingly, the

17  foregoing facts create a genuine issue of whether GCS and/or RMBT aided-and-abetted ADS and

18  QSS in violating the Proraters Law's maximum charge provision and whether GCS conspired with

19  ADS and QSS to violate that provision (for the reasons stated above RMBT cannot be held liable for

20  conspiracy to violate the Proraters Law).

21  F.   <u>Leave to Amend</u>

22         Although Newton seeks leave to amend all three claims (*i.e.*, CROA, CLRA, and Proraters

23  Law), because the Court grants summary judgment in favor of defendants as to her claims relating

24  under CROA, CLRA, and the Proraters Law's licensure provision, Newton's request to amend those

25  claims is denied as moot in part.  The main issue then is whether leave to amend should be granted

26  as to Newton's claim relating to violations of the Proraters Law which survive summary judgment.

27  ///

28  ///

1.      Legal Standard

Where a deadline for amending complaints has not been set, the standard set forth in Federal Rule of Civil Procedure 15 (and not the good-cause standard under Rule 16), governs requests for leave to amend.  *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) (noting that when the trial court has already issued a pretrial scheduling order the liberal standard of Rule 15 no longer applies).  The standard under Rule 15 governing requesting leave to amend is liberal:

> **(a) Amendments Before Trial.**
>
> **(1)** *Amending as a Matter of Course*...
>
> **(2)** *Other Amendments*.  In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should ***freely give leave when justice so requires***.

Fed. R. Civ. P. 15(a)(2) (emphasis added); *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (noting Rule 15[a] is applied with "extreme liberality") (internal citations omitted).  In determining whether "justice so requires," courts consider the "presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989) (citing *Foman v. Davis,* 371 U.S. 178, 182 [1962]).  Here, the relevant factors are undue delay and undue prejudice.[5]

2.      Undue Delay

Newton did not unduly delay moving to amend her complaint.  Though Newton waited 21 months to move to amend, the Court has not yet issued a pretrial scheduling order, setting a cutoff for amended complaints.  And while the matter has been pending for some time, the defendants devoted substantial time moving to compel arbitration, appealing the Court's order denying the motion, and moving for stay pending resolution of the appeal, which the Court ultimately denied in August 2012.  *See* Docket No. 99 (Order Denying Motion to Stay).

---

[5] Other factors identified by defendants are no longer relevant.  Thus, for example, the Court's consideration of defendants' summary judgment motions irrespective of the motion for leave to amend renders moot defendants' argument that the timing of Newton's motion is designed to circumvent summary judgment.  Similarly, the Court's ruling on Newton's claim relating to the Proraters Law which survive summary judgment renders irrelevant defendants' futility arguments in part.

United States District Court

For the Northern District of California

To further evaluate undue delay, a court may also consider whether facts and theories raised by the amendment were known by the moving party at an earlier time. *See Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir. 1994). Newton does not rebut defendants' assertions she possessed prior knowledge of her current theories. *See* Docket No. 175 (Reply, at pg. 5) (Newton responds she amended her complaint in "an abundance of caution to foreclose" future arguments by Defendants "that no allegations of concerted activity existed."). However, Newton contends her complaint does contain allegations of concerted action. *See* Docket No. 11 (FAC, at ¶ 2 ["Defendants participated in a scheme . . . "], ¶ 4 ["Defendants divided up these various functions among themselves . . . "], ¶ 7 ["Defendants collectively acted as a prorater . . . ", and ¶ 27 ["Each Defendant, when acting as the agent of another Defendant, carried out a joint scheme . . . "]). Furthermore, discovery has not yet closed. *See* Docket No. 167 (Motion for Leave to Amend, at pps. 3, 4). Even if the Court were to find undue delay, this factor alone is insufficient to deny leave to amend. *See Bowles v. Reade,* 198 F.3d 752, 758 (9th Cir. 1999) ("Undue delay by itself, however, is insufficient to justify denying a motion to amend.").

        3.    <u>Undue Prejudice</u>

Undue prejudice is the single most important factor. *See Eminence Capital*, 316 F.3d at 1052 (prejudice is the "touchstone of the inquiry under rule 15[a]"). The prejudice to defendants must be substantial, however. *See Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990) (finding "radical shift in direction posed by [new] claims" would have substantially prejudiced defendants); 6 Wright, Miller & Kane, Federal Practice and Procedure § 1487 (2d ed. 1990) ("amendment substantially" changing the theory which would require "significant new preparation" deemed "prejudicial."); *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) ("Allowing plaintiff to 'advance different legal theories and require proof of different facts' at this stage in the litigation would have prejudiced [defendant]" substantially). "Any prejudice to the nonmovant must be weighed against the prejudice to the moving party by not allowing the amendment." *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998).

Defendants bear the burden of demonstrating prejudice. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987) ("The party opposing amendment bears the burden of showing

United States District Court

For the Northern District of California

1  prejudice"). Defendants have failed to show substantial prejudice. Their asserted prejudice is not

2  well articulated. *See* Docket No. 174 (Opp'n, at pgs. 8-9) (granting leave to amend will "erase" or

3  "whiteout" "two years of litigation"; referring to "substantial expense expended" to prepare

4  "respective MSJs"). Defendants' most cogent articulation of prejudice is the need for "additional

5  class discovery on the new theories raised." *Id*. at 10. The mere prospect of additional discovery is

6  insufficient; rather, the prejudice must be undue and related to timing. *See Genentech, Inc. v. Abbott*

7  *Laboratories*, 127 F.R.D. 529, 531 (N.D. Cal. 1989) (delay caused by additional discovery alone is

8  not undue prejudice); *Abad v. Waste Connections, Inc.*, No. 12-CV-6708 (DDP-RZX), 2013 WL

9  1163982, *2 (C.D. Cal. Mar. 20, 2013) ("additional discovery alone is [not] sufficient prejudice").

10  Typically undue prejudice occurs when the sequence and timing of important litigation events, such

11  as trial, are disrupted. *See, e.g.*, *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980,

12  986 (9th Cir. 1999) ("A need to reopen discovery and therefore delay the proceedings supports a

13  district court's finding of prejudice from a delayed motion to amend the complaint."). No such

14  disruption is cited here.

15      While Defendants contend prejudice arising from delay of the class certification proceedings,

16  the Court finds any such delay would be minor. Newton is not seeking to file a renewed or amended

17  class certification motion, and the Court fully expects that defendants need only be offered an

18  additional opportunity to supplement their opposition to Newton's class certification motion.

19  Because only one claim remains, the Court anticipates discovery to be limited. In any case, the

20  Court may focus discovery, as needed, to minimize any impact on delay to the class certification

21  proceedings. On the other hand, the potential prejudice to Newton is substantial – preclusion from

22  asserting aider-and-abettor and conspiracy liability for violation of the Proraters Law – the only

23  basis for recovery remaining. In sum, the Court finds that the prejudice of having to conduct

24  additional class discovery and possible minimal delay to class certification proceedings does not

25  outweigh the prejudice to Newton. Accordingly, Newton's request for leave to amend is

26  GRANTED.

27  ///

28  ///

### III.   CONCLUSION

Based on the foregoing, the Court rules as follows:

1.      Defendant GCS's and RMBT's motion for summary judgment as to Newton's CROA claim is **GRANTED**.

2.      Defendant GCS's and RMBT's motion for summary judgment as to Newton's CLRA claim is **GRANTED**.

3.      Defendant GCS's and RMBT's motion for summary judgment as to Newton's UCL claim is **GRANTED IN PART** (as to RMBT's liability for conspiracy to violate the Proraters Law), **and DENIED IN PART**; a claim of conspiracy by GCS and aiding and abetting by GCS and RMBT to violate the Proraters Law may proceed to trial.

4.      Plaintiff Newton's motion for leave to amend the First Amended Complaint is **DENIED** as to any claim of conspiracy by RMBT to violate the Proraters Law, and **GRANTED** as to the remaining claims.

This order disposes of Docket Nos. 142, 143, and 167.


IT IS SO ORDERED.


Dated:  October 10, 2013

_____
EDWARD M. CHEN
United States District Judge