United States District Court
For the Northern District of California

1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8    HEATHER L. NEWTON,                          No. C-11-3228 EMC

9              Plaintiff,

10         v.                                    **ORDER GRANTING IN PART AND**
                                                 **DENYING IN PART DEFENDANTS'**
11   AMERICAN DEBT SERVICES, INC., *et al.*,     **MOTION FOR SUMMARY JUDGMENT**

12             Defendants.                       **(Docket No. 238)**
     _____/

13

14                          **I.   INTRODUCTION**

15         Plaintiff Heather Newton filed a putative class action lawsuit against Defendants American

16   Debt Services (ADS), Quality Support Services (QSS), Global Client Solutions (Global) and Rocky

17   Mountain Bank and Trust (RMBT, or the Bank) alleging various violations of California and Federal

18   law relating to Defendants' debt-settlement enterprise.  *See* Docket No. 1 (Complaint).  Global and

19   RMBT are the only remaining defendants after ADS and QSS defaulted.  Docket Nos. 156, 199

20   (Entry of Default).

21         After this Court dismissed a number of Plaintiff's causes of action, and rejected certain of her

22   legal theories, Plaintiff filed her second amended (and operative) complaint.  Docket No. 206

23   (Second Amended Complaint).  In that complaint, Plaintiff alleges that RMBT violated all three

24   prongs of California's Unfair Competition Law (UCL) where it purportedly breached the terms of a

25   2009 Cease and Desist Order entered into between RMBT and the Federal Deposit Insurance

26   Corporation (FDIC).  *Id.* at 17.  Plaintiff also claims that RMBT and Global each aided-and-abetted

27

28

**United States District Court**
For the Northern District of California

1   ADS's and QSS's violation of California's Proraters Law.[1]  *Id.* at 19.  RMBT and Global now seek

2   summary judgment that these causes of action fail as a matter of law.

3        For the reasons explained below, this Court grants summary judgment in favor of RMBT on

4   all of Newton's UCL claims predicated on violations of the FDIC Order.  Newton's "unlawful" and

5   "unfairness" prong claims fail because the FDIC Order cannot be enforced in this Court or otherwise

6   "borrowed" to serve as a predicate law violation under the UCL.  And Newton's "fraudulent" prong

7   claim fails because Newton did not respond to Defendants' summary judgment motion on this

8   ground, thereby conceding the claim as a matter of law.  However, the Court denies RMBT's and

9   Global's summary judgment motion regarding Newton's aiding-and-abetting causes of action.  As

10  this Court has previously held, those claims may proceed to trial.

11                    **II.   BACKGROUND**[2]

12  A.    Factual Background

13        1.    Newton's Debt Settlement

14        Plaintiff Heather Newton resides in Santa Clara County.  Docket No. 206 at 4.  Defendants

15  ADS, QSS, Global, and RMBT collectively provided debt settlement services to Newton.  ADS is a

16  debt settlement company that advertised its services online to consumers.  *See* Docket No. 146-4

17  (Ex. D to Leonard Decl.) (Newton Depo., at pg. 16).  Newton found ADS's webpage offering debt

18  settlement assistance.  *Id.*  In August 2009, Newton signed up online for ADS's services.  *See*

19  Docket No. 146-1 (Ex. A to Leonard Decl., at pg. NEWTON_00058).  Newton and ADS agreed that

20  ADS would provide debt settlement and restructuring services, which consisted of negotiating with

21  creditors on Newton's behalf for reduction of debt and formulation of a payment plan.  *See* Docket

22  No. 146-1 (Ex. A to Leonard Decl., at pg. NEWTON_00054).

23        For its part in this debt settlement enterprise, QSS agreed to provide "customer service

24  functions" and other services to process debt settlements for ADS clients.  *See* Docket No. 185 (Ex.

---

[1]  The Proraters Law is codified at Cal. Fin. Code § 12000, *et seq*.

[2]  This Court's earlier orders describe the factual and procedural background of this case in significant detail.  *See, e.g.*, *Newton v. American Debt Services, Inc.*, No. C-11-3228 EMC, 2013 WL 5592620 (N.D. Cal. Oct. 10, 2013); *Newton v. American Debt Services, Inc.*, No. C-11-3228 EMC, 2014 WL 806152 (N.D. Cal. Feb. 27, 2014).

United States District Court

For the Northern District of California

3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00057).  QSS bills itself as "one of the premier providers of account management and debt settlement services in the United States."  *See id*. (Ex. 9 to Kennedy Decl., at ¶ 7).  Plaintiff has presented evidence that neither ADS or QSS were licensed to provide these debt-settlement services to California consumers, as required under California's Proraters Law.  *See* Docket No. 251-4 (Certificates of California Department of Business Oversight indicating no record of a license for either ADS or QSS); *see also* Cal. Fin. Code § 12200.[3]  Neither Global or RMBT appear to dispute that ADS and QSS operated without the necessary license.

Global's role in the debt-settlement scheme was to create bank accounts for ADS clients to "accumulate and disburse funds in connection with the repayment of their debts."  *See* Docket No. 251-4. (Ex. 3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00056).  Essentially, Global is a payment processor for consumers who are enrolled in debt settlement programs.  *See id*.  Global touts itself as "a leading provider of account management services to the debt settlement industry today."  *See* Docket No. 185 (Ex. 4 to Kennedy Decl.).

RMBT, a Colorado-chartered bank, agreed to provide custodial bank accounts (sometimes referred to as "Special Purpose Accounts") for debt settlement companies and their clients, such as ADS and Newton.  *See* Docket No. 185 (Ex. 2 to Kennedy Decl., at pg. RMBT-CONFIDENTIAL-00002, ¶¶ 3.1).  As part of Newton's agreement with ADS, Global opened and administered a Special Purpose Account in Newton's name at RMBT.  *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Dep. 36:22-38:13).  Global maintained access to Newton's payment history, including how much ADS and QSS charged Newton for debt settlement services.  *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶¶ 1[b], 1[d]).  And Global agreed to provide ADS and QSS with access to Newton's account activity, including deposits and withdrawals.  *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶ 1[g]).  RMBT had independent access to these pieces of information.  *See* Docket No. 185 (Ex. 6 to Kennedy Decl.) (Hampton Depo., at pgs. 24-25).

---

    [3] Section 12200 provides that "[n]o person shall engage in the business, for compensation, of . . . receiving money as agent of an obligor for the purpose of paying bills, invoices, or accounts of such obligor, or acting as a prorater . . . without first obtaining a license from the commissioner."

United States District Court

For the Northern District of California

Once enrolled in the debt settlement program, Newton stopped paying her credit card bills and ceased communications with creditors, per a defendant's instruction. *See* Docket No. 163 (Newton Decl. ¶ 7). In March 2010, Newton received a call from one of her creditors, Bank of America. *See id*. at ¶ 8. Bank of America stated she owed $2,200. *See id*. at ¶ 10. Newton learned that none of the Defendants had contacted Bank of America regarding a debt settlement. *See id*. at ¶ 9. Newton asked Defendants to pay Bank of America $1,100 from her Special Purpose Account at RMBT, and Defendants complied. *See id*. at ¶ 12.

In April 2010 another creditor, Chase, served Newton with a summons and complaint in a collection action. *See id*. at ¶ 14. Newton subsequently settled the debt without assistance from Defendants. *See id*. at ¶ 18. Newton also settled with a third creditor (Capital One) without assistance. *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Depo., at pg. 56). In June 2010, Newton terminated her account with ADS via certified letter. *See id*. at ¶ 19. Ultimately, Newton paid a total of $4,206.50 into the Special Purpose Account at RMBT, of which $70.04 was eventually refunded to her, $2,200 was paid to Bank of America, and the balance of which Defendants kept. *See id*. at ¶ 20. Records maintained by Global confirm that Newton was charged $1,936.46 in "Customer Fees" and "Transaction Fees." *See* Docket No. 185 (Ex. 1 to Kennedy Decl., at pgs. GLOBAL.R26.00003-GLOBAL.R26.00005). These amounts appear well in excess of those allowed under the Proraters Law. *See* Calif. Fin. Code § 12314.[4]

     2.   <u>Regulatory Actions Against Global and RMBT</u>

Both Global's and RMBT's involvement in the debt-settlement industry raised the attention of government regulators. *See, e.g.*, Docket Nos. 164-1; 164-2 (Regulatory Letters). In 2008, the California Department of Corporations targeted Global, along with others, for prorating without a license and collaborating with other companies, including RMBT, to prorate without a license. *See* Docket No. 164-2 at 1-6. The Department of Corporations specifically ordered Global, "in concert

---

[4] Specifically, Section 12314 of the Proraters Law provides that "the total charges received by a prorater, or any other person for the prorater's services, may not exceed in the aggregate twelve percent (12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000), and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor, except for payments made on recurrent obligations."

and/or in participation with others, to desist and refrain from engaging in business as bill payers and proraters unless and until they are licensed or exempt [from the licensing requirement]." *Id.* at 6.

The FDIC targeted RMBT in 2009. Specifically, on April 2, 2009, RMBT consented to the issuance of a cease and desist order (hereafter, the FDIC Order, or the Order) without a hearing. Docket No. 164-1 (FDIC Order). According to the Order, the FDIC "had reason to believe that the Bank had engaged in unsafe or unsound banking practices and had violated laws and/or regulations." *Id.* at 1. Consequently, RMBT was ordered to cease and desist a number of such practices, including "[f]ailing to appropriately monitor and/or manage third-party risk and operating in contravention of the FDIC's Guidance for Managing Third-Party Risk." *Id.* at 2-3. Specifically, the Order required RMBT to "provide adequate and effective oversight over the Bank's third-party relationships, specifically focusing on monitoring the activities of third-party payment processors and their customers, who are referred to herein as Debt Settlement Companies ('DSC')." *Id.* at 19. The FDIC also ordered RMBT to review, revise, and implement "third-party policies" that would "[e]nsure the Bank's compliance with Federal and state consumer protection laws, regulations, and policies" *id.*, and further required the "development of internal monitoring procedures to:

    (i)    Ensure ongoing review of each payment processor, ACH originator, and DSC;

    (ii)    Maintain documentation demonstrating that each payment processor, ACH Originator, and DSC's activities are beneficial to consumers; [and]

    (iii)    Ensure that payment processors, ACH originators, and DSCs rectify harmful consumer activity or the Bank shall cease operations with the payment processor, ACH originator, and/or DSC . . ."

*Id.* at 20. RMBT was required to submit its revised policies to the FDIC within 60 days of the effective date of the Order.[5] *Id.* at 19-20. The FDIC had 30 days to provide comments on the Bank's policies. *Id.* at 20. After receiving any FDIC comments, the Order required that "the Bank shall approve the revised policies . . . [and] shall implement [them]." *Id.* at 21.

---

[5] The effective date of the Order is April 2, 2009. *Id.* at 28.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    In the months after the Order was issued, the FDIC and RMBT engaged in several rounds of

2  correspondence regarding RMBT's alleged noncompliance with the Order.  *See generally* Docket

3  No. 250-5 (Ex.1 to Kennedy Decl.)  For instance, on November 17, 2009, the FDIC wrote to RMBT

4  to indicate that Bank management had not sufficiently addressed the third-party risk provisions of

5  the Order.  *Id.* at RMBT.CONFIDENTIAL.00005589.  The FDIC specifically noted that RMBT's

6  third-party risk policy was missing significant items, including information regarding how RMBT

7  would determine whether a payment processor, such as ADS or QSS, was abiding by state legal

8  requirements such as California's Proraters Law.  *Id.* at RMBT.CONFIDENTIAL.0005592.  FDIC

9  also noted that RMBT had not reviewed the legal requirements for its debt-settlement partners in all

10  states where those companies do business, and that neither RMBT nor Global established that its

11  partners can legally conduct business in the states where they operate.  *Id.*  The FDIC chastised

12  RMBT for failing to review its partners' compliance with state UDAP requirements, debt settlement

13  laws, and licensing requirements.  *Id.* at RMBT.CONFIDENTIAL.00005593.

14    RMBT responded to the FDIC's criticism in December 2009, but despite RMBT's purported

15  efforts to comply with the Order, later correspondence from the FDIC indicates that it remained

16  largely unsatisfied with RMBT's revised policies and procedures to monitor third-party debt

17  servicing companies (like Global, QSS, and ADS) and ensure their compliance with state laws.  For

18  example, on February 24, 2010, FDIC stated that deficiencies continued regarding RMBT's

19  substantive compliance with the Order, and specifically the Third Party Risk provisions.  *Id.* at

20  RMBT.CONFIDENTIAL.00005810.  FDIC further reiterated an earlier demand that RMBT develop

21  and submit a plan to terminate its relationship with Global in a timely manner given RMBT's

22  alleged noncompliance with the Order.  *Id.*

23    On April 20, 2010, RMBT wrote to Global informing it that RMBT "has been directed by the

24  Federal Deposit Insurance Corporation to terminate its entire . . . relationship" with Global.  *Id.* at

25  RMBT.CONFIDENTIAL.00005869.  RMBT informed Global that all Special Purpose Accounts at

26  the Bank serviced by Global would be terminated by August 31, 2010.  *Id.*

27    The FDIC finally expressed satisfaction with RMBT's compliance with the third-party risk

28  provisions of the Order on February 24, 2011.  *Id.* at RMBT.CONFIDENTIAL.00006021.  But even

1   though the FDIC expressed frustration with RMBT's compliance with the Order in correspondence

2   exchanged over a period of years, it is undisputed that the FDIC never sought to enforce the Order in

3   court, or otherwise conclusively determined in an appropriate proceeding that RMBT had, in fact,

4   violated the terms of the Order.

5   B.   Procedural History

6       Newton filed this putative class action on behalf of herself and similarly situated consumers

7   on June 29, 2011.  Docket No. 1.  Defendants moved to compel arbitration of Newton's claims.

8   Docket Nos. 36, 39.  This Court denied the motion and the Ninth Circuit affirmed.  Docket Nos. 72,

9   224.  While the Ninth Circuit appeal was pending, ADS and QSS defaulted.  Docket Nos. 156, 199.

10      On April 22, 2013, Global and RMBT filed separate summary judgment motions attacking a

11  number of Newton's legal theories.  Specifically, they argued that Newton's claims against them

12  under the Credit Repair Organizations Act (CROA)[6] and California Legal Remedies Act (CLRA)[7]

13  failed as a matter of law.  *See* Docket No. 204.  Global and RMBT also argued that Newton's UCL

14  claims that they conspired to violate, or aided-and-abetted violations of, California's Proraters Law

15  could not proceed to trial.  *Id.*  The Court granted summary judgment with respect to the CROA and

16  CLRA claims, and also granted summary judgment in favor of RMBT on Newton's conspiracy

17  claim.  *Id.* at 26.  The Court denied summary judgment on the remaining UCL indirect liability

18  claims, holding that the "facts create a genuine issue of whether [Global] and/or RMBT aided-and-

19  abetted ADS and QSS in violating the Proraters Law's maximum charge provision and whether

20  [Global] conspired with ADS and QSS to violate that provision . . . ."  *Id.* at 22.  The Court also

21  noted that "there is [] sufficient evidence to infer that both [Global] and RMBT aided and abetted

22  violations of the licensing provision" of the Proraters Law.  *Id.* at 21.  Newton's motion to amend

23  her complaint was granted with regards to the Proraters Law claims that the Court determined had

24  survived summary judgment.  *Id* at 22-25.  Newton filed her Second Amended Complaint on

25  October 17, 2013.  Docket No. 206.

26

27      [6]  Codified at 15 U.S.C. § 1679, *et seq.*

28      [7]  Codified at Cal. Civ. Code § 1750, *et seq.*

United States District Court
For the Northern District of California

1    In spite of the fact that this Court had already determined that Newton's aiding-and-abetting

2    claims (and conspiracy claim against Global) could proceed to trial, Global and RMBT filed a

3    motion to dismiss these claims after they were re-pleaded in the Second Amended Complaint.

4    Docket No. 209.  The Court denied the motion, rejecting Global's and RMBT's latest contention

5    that the California Supreme Court's decision in *Zhang v. Superior Court*, 57 Cal. 4th 364, 384

6    (2013) "precludes Newton from asserting a UCL claim predicated on alleged violations of the

7    Proraters Law."  Docket No. 223 at 7.  The Court went on to note that "in light of its [prior]

8    summary judgment holding, the Court finds that Newton has alleged sufficient facts to survive a

9    motion to dismiss" her UCL claims predicated on violations of the Proraters Law.  *Id.* at 8.

10   On May 15, 2014, Global and RMBT once again filed for summary judgment.  Docket No.

11   238.  RMBT argues it is entitled to summary judgment on those of Newton's UCL claims which are

12   predicated on RMBT's alleged violation of the FDIC Order.[8]  Specifically, RMBT argues that: (1)

13   the Order is not an independent law that can be borrowed for purposes of establishing liability under

14   the "unlawful" prong of the UCL; (2) RMBT did not violate any affirmative commands of the Order,

15   and thus it could not have committed either "unlawful" or "unfair" acts under the UCL; and (3) any

16   conduct in violation of the Order could not establish liability under the "fraudulent" prong of the

17   UCL because Newton did not know about the FDIC Order or otherwise rely on RMBT to act in

18   compliance with that Order.  *Id.* at 7-18.  Global and RMBT also argue that they are entitled to

19   summary judgment on Newton's UCL claims alleging that Global and RMBT aided-and-abetted

20   ADS's and QSS's violations of the Proraters Law – the exact same argument this Court has

21   previously rejected in two written orders.  *See* Docket Nos. 204, 223.

22

23   _____

24   [8] RMBT previously moved for summary judgment on these direct UCL claims, although the
     entirety of its argument took up just two paragraphs of its summary judgment brief.  *See* Docket No.

25   143 at 18.  The Court did not address RMBT's arguments about the direct UCL claims in its original
     summary judgment order.  *See* Docket No. 204.  Defendants are advised that the proper procedure in

26   this Court is to file a motion for reconsideration where an independent issue raised in a summary
     judgment motion is not addressed in the eventual order disposing of the motion.  This Court strongly

27   disfavors the alternate procedure Defendants employed here, namely filing a second (and
     significantly more detailed) summary judgment motion premised on the identical grounds raised in

28   the original summary judgment motion.  *See* Civ. Standing Order No. 9 (limiting each side to one
     summary judgment motion unless leave of Court is granted).

**United States District Court**
For the Northern District of California

# III.   DISCUSSION

A.   RMBT is Entitled to Summary Judgment on Newton's UCL Claims That Are Predicated on
"Violations" of the FDIC Order Because This Court Cannot Enforce That Order Either
Directly or Indirectly

All three of Newton's remaining direct UCL claims are predicated on allegations that RMBT violated the terms of the FDIC Cease and Desist Order.  Specifically, Newton alleges that: (1) "RMBT's ongoing business relationship with [Global] and QSS is unlawful, in that it violates the Federal Deposit Insurance Corporation's Cease and Desist Order of April 2, 2009"; (2) RMBT's "conduct in violation of the Cease and Desist Order was and is unfair in that the harm to consumers from [RMBT's] conduct outweighs the utility of that conduct"; and (3) RMBT's conduct in violation of the Cease and Desist Order "was and is fraudulent in that it tends to mislead the general public."  Second Amended Complaint at ¶¶ 107-109.  Succinctly stated, Newton alleges that RMBT violated the FDIC Order, and thereby transgressed all three prongs of the UCL.  *See* Cal. Bus. and Prof. Code § 17200 ("As used in this chapter, unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice . . . .").

In its latest motion for summary judgment, RMBT argues that all of Newton's UCL claims predicated on violations of the FDIC Order necessarily fail because this Court lacks jurisdiction to enforce the FDIC Order, either directly or indirectly, and similarly lacks the institutional competence to determine whether the FDIC Order was, in fact, violated.  For the reasons explained below, the Court agrees with RMBT.

     1.   The FDIC Order Cannot Be "Borrowed" Under the UCL Unlawful Prong

The UCL substantively prohibits business acts or practices that are "unlawful."  *See* Cal. Bus. and Prof. Code § 17200.  As the California Supreme Court has explained, "section 17200 'borrows' violations of other laws and treats them as unlawful practices independently actionable" under the UCL.  *Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (Cal. 1994) (quoting *Farmers Ins. Exchange v. Superior Court*, 2 Cal. 4th 377, 383 (1992)).  Thus, as one leading treatise author has noted, "if a 'business practice' violates any law – literally – it also violates §17200 and

United States District Court

For the Northern District of California

1    may be redressed under that section."  William L. Stern, *Business and Professions Code §17200*

2    *Practice*, 3:56 (Rutter Group 2014 ed.) (quoting Cal. Bus. and Prof. Code §17200).

3         RMBT argues that Newton's claim under the unlawful prong of the UCL must fail because

4    the 2009 FDIC Order is not an "independent law" that can be borrowed to serve as a predicate for a

5    UCL violation.  Docket No. 238 at 9-12.  Neither party submitted any case law (and the Court has

6    found none in its own research) addressing whether a regulatory order or consent decree, like the

7    FDIC Order here, can form the basis of an alleged violation of §17200's unlawful prong.  Hence,

8    this Court considers this issue on a clean slate.

9         The slate, however, is not entirely spotless: California courts have previously found that the

10   UCL provides a cause of action to remedy an extremely wide variety of allegedly "unlawful"

11   behavior. "Virtually any law or regulation – federal or state, statutory or common law – can serve as

12   predicate for a §17200 'unlawful' violation."  Stern, *Business and Professions Code §17200*

13   *Practice*, 3:56 (Rutter Group 2014 ed.).

14        Consideration of a small sample of exemplar cases demonstrates just how broadly certain

15   courts have interpreted the reach of UCL's unlawful prong.  For instance, in *Garrett v. Coast &*

16   *Southern Fed. Sav. & Loan Assn.*, 9 Cal. 3d 731 (1973), the California Supreme Court interpreted a

17   provision of the California Civil Code to prohibit contracts which pre-set the amount of damages to

18   be awarded in the event of a default, unless such damages would be "impracticable" to calculate or

19   otherwise "extremely difficult to fix." *Id.* at 738.  In a later case, *Bondanza v. Peninsula Hospital &*

20   *Medical Center*, 23 Cal. 3d 260, 266-68 (1979), the Supreme Court was asked to determine whether

21   a hospital's 33% surcharge on delinquent or defaulted accounts was a contractual penalty, and

22   therefore violated the rule prohibiting such penalties announced in *Garrett*.  The *Bondanza* court

23   concluded that the surcharge was an even "more patent violation" than the one in *Garrett*, and

24   concluded that the 33% assessment was thereby "plainly unlawful" under the UCL.  *See id* at 266-

25   67.  That is, the *Bondanza* court "borrowed" the case law rule announced in *Garrett*, and found that

26   violation of that rule was an independent violation of the UCL's "unlawful" prong.  *See id.* at 268

27   (holding that the Court was "compelled to decide on the authority of *Garrett* that the defendants'

28   conduct herein is unlawful"); *see also Community Assisting Recovery, Inc. v. Aegis Security*

United States District Court

For the Northern District of California

*Insurance Co.*, 92 Cal. App. 4th 886, 891 (Cal. 2001) (acknowledging that "an unlawful business practice actionable under the UCL is one that violates an existing law, including case law"). (internal quotation marks and citation omitted).

A panel of the Court of Appeal went even further in *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499 (Cal. 1997). In *Hewlett*, Defendant Squaw Valley Ski Corporation violated a temporary restraining order (TRO) issued by the trial court. *See Id.* at 533. Rather than bringing contempt proceedings against Squaw, plaintiffs instead filed an action alleging that Squaw had violated the "unlawful" prong of §17200. *Id.* Squaw argued that a TRO could not be borrowed to serve as predicate authority for the purposes of the UCL, particularly where the TRO could be enforced directly via contempt proceedings. *Id.* at 535. The Court of Appeal disagreed, holding that "proceedings under the unfair competition statutes are cumulative to other possible remedies or penalties, and violations of a TRO may therefore be prosecuted as an unlawful business practice." *Id.* (citations omitted).

The Ninth Circuit has also weighed in, albeit briefly, on the sweep of the UCL's unlawful prong. In *CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099 (9th Cir. 2007), the court held that a plaintiff had adequately alleged a violation of the unlawful prong where he claimed that the defendant had "stolen" his employees in violation of the common law prohibition against intentional interference with employment contracts. *Id.* at 1107. The panel noted that its conclusion was a simple one given that the "California Supreme Court has given the term 'unlawful' a straightforward and broad interpretation . . . [that] 'embraces anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Id.* (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1143 (2003)). The California Supreme Court later confirmed that the UCL "unlawful" prong may borrow obligations imposed solely by the common law. *Zhang*, 57 Cal. 4th at 384.

Still, "[a]lthough the unfair competition law's scope is sweeping, it is not unlimited." *Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 182 (1999). One such limit particularly relevant here is the prohibition on borrowing laws for the purposes of UCL liability where those laws provide a "safe harbor" for the challenged conduct or otherwise "bar"

enforcement of the relevant statutory provision.  *See id.* at 182-83; *see also Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566 (1998) (observing that the "UCL cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law"). Thus, where a private right of action under a given statute is "absolutely barred, a litigant may not rely on the proscriptions of [that law] as the basis for a UCL claim."[9]  *Zhang*, 57 Cal. 4th at 384; *see also id.* (explaining that violations of section 790.03 of the Unfair Insurance Practices Act cannot be borrowed under the UCL because that statutory provision "contemplate[s] only administrative enforcement by the Insurance Commissioner.  Private UIPA actions are absolutely barred").  Where there is a clear legislative directive barring court enforcement in favor of administrative enforcement, the UCL may not be employed to circumvent that directive.

Here, RMBT argues that private enforcement of the FDIC Order is absolutely barred as a matter of federal law, and thus this Court cannot "borrow" the Order for the purpose of imposing liability under the UCL.  RMBT appears correct.

The 2009 FDIC Order was issued pursuant to powers granted the FDIC by Congress in 12 U.S.C. § 1818.  That section provides (among numerous other things) that the FDIC may institute cease-and-desist proceedings against any financial institution that has engaged in, or is about to engage in, "unsafe or unsound practices."  12 U.S.C. § 1818(b)(1).  Congress further provided that the FDIC may issue cease-and-desist orders that are "mandatory" in nature or which otherwise require a regulated bank to "take affirmative action to correct the conditions resulting from any such violation or practice."  *Id.*

As relevant here, however, Section 1818 also contains a jurisdictional provision which states that "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order [issued under this section], or to review, modify, suspend, terminate, or set aside such notice or order."  12 U.S.C. § 1818(i)(1).  Section 1818(i)(1) reads in its entirety:  "The appropriate Federal banking agency may in its discretion apply to the United States district court, or

---

[9] It is important to note that in order to defeat borrowing under the UCL, the putative predicate law must "actually bar" enforcement, "not merely fail to allow it."  *Cel-Tech Communications, Inc.*, 20 Cal. 4th at 184.  "Plaintiffs may not plead around a safe harbor, but the safety must be more than the absence of danger."  *Id.* (internal quotation marks omitted).

1   the United States court of any territory, within the jurisdiction of which the home office of the

2   depository institution is located, for the enforcement of any effective and outstanding notice or order

3   issued under this section or under section 1831o or 1831p-1 of this title, and such courts shall have

4   jurisdiction and power to order and require compliance herewith; but except as otherwise provided

5   in this section or under section 1831o or 1831p-1 of this title[,] *no court shall have jurisdiction to*

6   *affect by injunction or otherwise the issuance or enforcement of any notice or order under any such*

7   *section, or to review, modify, suspend, terminate, or set aside any such notice of order*." *Id.*

8   (emphasis added).  Were this Court to "borrow" the FDIC Order as predicate authority for a UCL

9   violation, and thereby allow Newton to litigate her claims that RMBT acted unlawfully by

10  contravening that Order, it most certainly would "affect . . . enforcement" of the Order. *See id.*  This

11  Court would be in a position of adjudicating and, in that process, interpreting the Order.

12  Accordingly, Section 1818(i)(1) bars Newton's UCL claims predicated on RMBT's alleged

13  violations of the FDIC Order because it expressly prohibits this Court from enforcing, or even

14  "affect[ing]" the enforcement of, the FDIC Order.

15          Newton argues otherwise, and cites two out-of-district cases that have construed the

16  jurisdictional provisions of section 1818(i)(1), *In re JPMorgan Chase Mortgage Modification*

17  *Litigation*, 880 F. Supp. 2d 220 (D. Mass 2012), and *Rex v. Chase Home Finance LLC*, 905 F.

18  Supp. 2d. 1111 (C.D. Cal. 2012).  In each of those cases, the district court concluded that the

19  jurisdiction-divesting clause of Section 1818(i)(1) did *not* prevent the court from adjudicating

20  plaintiffs' claims that the defendant banks violated various state consumer protection laws.  But

21  those courts' decisions are entirely consistent with this Court's holding:  In both *Rex* and *In re*

22  *JPMorgan Chase*, the defendant bank was attempting to use a regulatory cease-and-desist order as a

23  shield against liability for practices that allegedly violated other consumer protection laws, whereas

24  here, Newton is attempting to use the FDIC Order itself as a sword, and asks the fact-finder to hold

25  that RMBT actually violated the Order.  In short, Section 1818(i)(1) does not prevent a court from

26  adjudicating the legality of conduct under substantive laws and regulations simply because the FDIC

27  has taken similar or parallel actions.  What it bars is enforcement of an FDIC cease and desist order

28

United States District Court
For the Northern District of California

1    itself (as distinct from the substantive regulatory law being enforced) other than by a court

2    specifically vested with such jurisdiction under Section 1818(i)(1).

3           Plaintiffs in *Rex* sued Chase for alleged misrepresentations and other unlawful acts

4    undertaken in connection with their Chase mortgages.  *Rex*, 905 F. Supp. 2d. at 1119.  According to

5    plaintiffs, Chase promised to release them from the obligation to pay any remaining balance

6    outstanding on their mortgages after the plaintiffs sold their properties at a loss.  *Id.*  Instead, Chase

7    reneged on its promise, and "sought to collect the short sale deficiency and reported Plaintiffs'

8    failure to pay it to credit reporting agencies."  *Id.*  Plaintiffs sued under a variety of statutes,

9    including the Consumer Credit Reporting Agencies Act (CCRAA), the Rosenthal Fair Debt

10   Collection Practices Act (FDCPA), and the UCL.  *Id.* at 1122.  Notably, however, the *Rex* plaintiffs'

11   UCL cause of action did not seek to enforce the terms of the regulatory cease-and-desist order;

12   rather it was a derivative claim for injunctive relief predicated on Chase's alleged violation of other

13   substantive statutes (such as the CCRAA and FDCPA).  *See id.* at 1130 n. 16.

14          Indeed, it was defendant Chase that raised the issue of the cease-and-desist order, namely an

15   order Chase and the Office of the Comptroller of the Currency (OCC) entered into nearly a year

16   before the *Rex* plaintiffs filed their complaint.[10]  *Id.* at 1121.  In that order, Chase agreed to adopt a

17   "compliance program" aimed to guarantee that Chase would, among other things, "ensur[e] effective

18   coordination of communications with borrowers" related to short sales and foreclosure activities.  *Id.*

19   That is, Chase's compliance with the cease and desist order arguably would have required it adopt a

20   monitoring program aimed to stop the very same misleading practices the plaintiffs later filed suit

21   over.  *See id.* at 1126.  Thus, Chase argued that the district court lacked jurisdiction to hear

22   plaintiffs' case under Section 1818(i)(1) because the consent order between Chase and the OCC

23   required Chase to adopt a plan to address short-sale mortgages, and any relief the district court itself

24   might fashion pursuant to other consumer protection laws regarding short-sale mortgages could

25   directly conflict with, or otherwise "affect . . . enforcement" of, the OCC order.  *Rex*, 905 F. Supp.

26

27   _____

28          [10]  Cease-and-desist orders issued by the OCC are governed by Section 1818, just like cease-and-desist orders issued by the FDIC.  *See id.* at 1124-25.

1  2d at 1126.  The district court was unpersuaded.  As there was no attempt to enforce the FDIC order

2  itself in *Rex*, Section 1818(i)(1) presented no bar.

3       The *Rex* court made this clear.  Following the reasoning of *In re JPMorgan Chase*,[11] the

4  court first explained that the "jurisdictional bar" in Section 1818 "'is not meant to displace a non-

5  party's right to present its claims to a federal court, or the jurisdiction of the court to hear those

6  claims,'" where the claims are related to, but not inextricably intertwined with, issues touched upon

7  in an OCC cease-and-desist order.  *Id.* (quoting *In re JPMorgan Chase*, 880 F. Supp. 2d at 232).  As

8  the court explained, "'it is clear that the Jurisdiction-Divesting Clause of Section 1818 was not

9  intended to prohibit non-parties from exercising their *separate remedies* at law.'"  *Id.* (quoting *In re*

10 *JPMorgan Chase*, 880 F. Supp. 2d at 232) (internal modification omitted) (emphasis added).

11 "Rather, 'the primary purpose of Section 1818 is to prevent federal courts from usurping the OCC's

12 power to enforce its own consent orders against parties to the orders.'"  *Id.* (quoting *In re JPMorgan*

13 *Chase*, 880 F. Supp. 2d at 232) (internal modification and emphasis omitted).

14      The *Rex* court then went on to explain that Congress did not intend Section 1818's

15 jurisdiction-stripping provision to permit regulated banks to hide behind regulatory cease-and-desist

16 orders whenever those banks faced independent lawsuits challenging their conduct under state or

17 federal consumer protection laws.  Referring to the legislative history of Section 1818, the court

18 explained that the provision was passed to "aggressively respond to the public perception that

19 financial institutions were playing fast and loose with the law and the public purse, courtesy of

20 deposit insurance."  *Id.* at 1131 (internal modifications and citation omitted).  Put differently, the

21 reforms of Section 1818 "reflected the philosophy that a terrified banker was going to be a better

22 banker."  *Id.* (citation omitted).

23

24

25      [11]  The district court in *In re JPMorgan Chase* rejected nearly the same argument later
26 rebuffed in *Rex*, namely that the cease-and-desist order between Chase and the OCC robbed the
   court of jurisdiction to hear a challenge to conduct addressed in the cease-and-desist order brought
27 by non-party plaintiffs under state consumer protection laws.  *See In re JPMorgan Chase*, 880 F.
   Supp. 2d at 231 (noting that "Chase argues that a review by this court of plaintiffs' claims may well
28 yield a result inconsistent with the Consent Order . . . a result which Congress intended to avoid,"
   but ultimately rejecting Chase's interpretation of Section 1818).

Particularly in light of the purposes of Section 1818, the *Rex* court concluded that it would be "absurd" to allow Chase to avoid liability for various state law violations simply because it had agreed to the entry of a cease-and-desist order with the OCC:

> [Chase]'s interpretation of Section 1818(i) would require this Court to read a regulatory statute designed to strike fear in the hearts of the banking industry as actually creating a jurisdictional mechanism by which banks can escape millions of dollars of liability in consumer class actions.  Essentially, Defendants' rule allows any defendant-bank to insulate itself from liability for practices that violate state contract and consumer laws simply by entering into an OCC consent order which requires the defendant-bank to develop a plan.  Under Defendants' rule, the defendant-bank could then use its promise to make a plan to divest courts of jurisdiction over numerous consumer lawsuits, even if the defendant-bank implements a plan that denies the very relief that plaintiffs seek in those lawsuits.

*Id.* (emphasis omitted).  Consequently, the court concluded that it did not lack jurisdiction to adjudicate plaintiffs' various state law claims regarding Chase's handling of short-sale mortgages.[12]

Hence, for the reasons stated above, the rule adopted in *Rex* is entirely consistent with this Court's determination that Section 1818(i) divests this Court of jurisdiction to hear Newton's UCL claims predicated on violations of the FDIC Order.  Here, RMBT does not seek to prevent adjudication of claims related to, or otherwise merely touching on, topics addressed in the FDIC Order.  Rather, Newton alleges that the very "unlawful" conduct that violates the UCL is RMBT's breach of the FDIC Order itself.  Essentially, Newton asks this Court to enforce the FDIC Order against RMBT.  But Congress has made clear that "no court" has the power to enforce the FDIC Order except for one from which the FDIC expressly requests enforcement.  *See* 12 U.S.C. § 1818(i)(1) (providing that a regulatory cease-and-desist order issued pursuant to Section 1818 may only be enforced upon application by the "appropriate Federal banking agency").

Indeed, Congress's decision to vest exclusive enforcement jurisdiction over Section 1818 orders to those courts specifically requested to enforce such orders by the federal banking agency itself highlights another problem this Court would face if it were to try to enforce the FDIC Order indirectly through the UCL.  Namely, without guidance from the regulator itself, this Court would

---

[12]  In effect, the court in *Rex* rejected an argument that was tantamount of a claim of field preemption – a result not justified in light of the statute's wording and purpose.

be venturing into a complicated regulatory order, and would likely have to interpret it without the benefit of an administrative record or the expertise of the FDIC.  For instance, the FDIC Order here prohibits fourteen separate categories of "unsafe or unsound" banking practices.  Were the Court to allow the Order to be "borrowed" as predicate authority under the UCL, a plaintiff could sue RMBT for violating any of these fourteen provisions.  But while some of these provisions might be easily interpreted, and violations therefore reasonably adjudicated, a number of the Order's requirements are not so easily amenable to interpretation.  For example, the Order requires RMBT to establish a "reasonable range for its net non-core funding ratio."  FDIC Order at 8(a)(1).  These terms are nowhere defined in the Order itself, and this Court would have to determine a "reasonable range" for RMBT's "net non-core funding ratio."  Permitting such court enforcement could lead to direct conflict between the Court and the FDIC in interpreting and enforcing the Order.  This example demonstrates why Congress likely chose to "prevent federal courts from usurping the [banking regulator's] power to enforce its own consent orders against parties to the orders.'"  *Rex*, 905 F. Supp. 2d at 1126 (quotation and emphasis omitted).

At bottom, Newton cannot "borrow" the FDIC Order to serve as predicate authority for a violation of the UCL's unlawful prong because Section 1818(i)(1) affirmatively prohibits this Court from enforcing, or even affecting the enforcement of, the FDIC Order.  *See Stop Youth Addiction, Inc.*, 17 Cal. 4th at 566 (observing that the "UCL cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law"); *Zhang*, 57 Cal. 4th at 384 (same).  Thus, RMBT's motion for summary judgment disposing of Newton's unlawful prong claim predicated on violations of the FDIC Order is granted.

       2.     <u>The FDIC Order Similarly Cannot Be Enforced Through the UCL's "Unfairness" Prong</u>

RMBT also requests summary judgment on Newton's claim that it violated the "unfair" prong of the UCL where it allegedly breached the terms of the FDIC Order.[13]  For the same reasons

---

[13]  A business practice is "unfair" for purposes of the UCL where "the utility of the defendant's conduct [is outweighed by] the gravity of the harm to the alleged victim."  *State Farm Fire and Casualty Co. v. Superior Ct.*, 45 Cal. 4th 1093, 1104 (1996).  Thus, an unfair practice is one that "offends an established public policy" or one which is "immoral, unethical, oppressive,

United States District Court
For the Northern District of California

1  Newton's unlawful prong claim must be dismissed, her unfairness prong claim must similarly be

2  dismissed – this Court lacks jurisdiction to indirectly enforce the FDIC Order via the UCL.

3      In her opposition to RMBT's summary judgment motion, Newton concedes that the only

4  "unfair" behavior targeted in her complaint is the "ongoing business relationship" between RMBT

5  and QSS, ADS, and Global.  Docket No. 250-4 at 18.  And in Newton's complaint, she directly and

6  exclusively pleads that the ongoing business relationship is "unfair" because it was "in violation of

7  the Cease and Desist Order."  Docket No. 206 at 17.  Thus, as pleaded, Newton's unfairness prong

8  claim turns on whether RMBT actually violated the FDIC Order, a determination this Court has

9  already concluded it lacks the power to make under Section 1818(i)(1).  *See* Part III.A.1, *supra*.

10     Newton tries to walk back this aspect of her complaint, arguing that what she meant to allege

11 is that the ongoing business relationship between RMBT, QSS, ADS, and Global was "unfair"

12 regardless of whether it actually violated the FDIC cease and desist order.  But this is not what her

13 complaint says.  The complaint says simply: "*Unfair*. Defendants' conduct in violation of the Cease

14 and Desist Order was and is unfair in that the harm to consumers from Defendants' conduct

15 outweighs the utility of that conduct."  Docket No. 206 at 17.  This claim clearly depends on Newton

16 proving that RMBT's conduct was "in violation of the Cease and Desist Order."[14]  *Id.*

17     Newton argues that if this Court finds (as it has) that it cannot adjudicate whether RMBT

18 actually violated the FDIC Order, that she be allowed to amend her complaint to allege that RMBT

19 acted unfairly simply by continuing its business relationship with its co-defendants irrespective of

20 the commands of the FDIC Order.  Such an amendment could possibly salvage Newton's claim.  But

21 _____

22 unscrupulous or substantially injurious to consumers."  *People v. Casa Blanca Convalescent Homes, Inc.*, 159 Cal. App. 3d 509, 530 (Cal. App. 1984).

23     [14]  Had Newton not cabined her allegations in this way, the Court likely could have

24 adjudicated whether or not it was "unfair" for RMBT to continue doing business with ADS, QSS, and Global irrespective of whether such a relationship actually violated the FDIC Order.  The mere

25 fact that FDIC had repeatedly warned RMBT about the unlawful practices of its co-defendants could have supported an inference that RMBT's ongoing business relationship with these companies was

26 unfair, as that term is broadly defined under the UCL.  *See Pirozzi v. Apple, Inc.*, 966 F. Supp. 2d 909, 922 (N.D. Cal. 2013) (holding that conduct is "unfair" where the utility of the defendant's

27 actions is outweighed by the harm to its victims).  But that is not Newton's theory of the case, and this Court will not consider arguments not timely raised by Newton herself.  *See Lopez-Vasquez v.*

28 *Holder*, 706 F.3d 1072, 1079-80 (9th Cir. 2013) (holding that arguments not raised by the parties are waived).

United States District Court

For the Northern District of California

such an amendment cannot be permitted at this late stage of the litigation. As the Ninth Circuit has repeatedly held, "summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (internal quotation marks omitted). Newton may not "effectively amend [her] Complaint by raising a new theory . . . in response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010). This action has been pending in this Court since 2011, and for that entire period the parties have proceeded on the understanding that Newton alleges that RMBT acted unfairly by actually violating the FDIC Order. This Court will not permit Newton to change her legal theories at this late date once faced with a motion for summary judgment, *see id.*,[15] particularly where Newton received notice of RMBT's arguments regarding the FDIC Order more than a year ago, and yet never sought leave to amend her complaint to adequately allege her "new" theory of the case until she filed her most recent opposition brief. *See* Docket No. 143 at 13 (RMBT's summary judgment motion filed April 22, 2013, arguing that Newton could not enforce the FDIC Order by way of the UCL). To permit Newton to amend the complaint at this late stage will invite a further motion to dismiss or for summary judgment along with additional discovery, causing undue delay and prejudice to Defendants.

### 3.   RMBT's Summary Judgment Motion on the "Fraudulent" Prong Is Granted

As the Court has previously explained, it lacks jurisdiction to even "affect" the enforcement of the FDIC Order. For this reason, dismissal of Newton's fraudulent prong claim predicated on violations of the FDIC Order would also seem appropriate. But RMBT is entitled to summary judgment on this claim for an even simpler reason: In her opposition, Newton does not address or respond to RMBT's arguments regarding the fraudulent prong. Nor does Newton provide any evidence that would be relevant to defeat summary judgment with respect to the fraudulent prong. Consequently, RMBT is entitled to summary judgment on this claim because Newton conceded it as a matter of law. *See, e.g., Mariscal v. Graco, Inc.*, -- F. Supp. 2d. --, 13-cv-02548-TEH, 2014 WL

---

[15] *See also In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07-1827 SI, 2012 WL 5411590, at *2 (N.D. Cal. Nov. 6, 2012) (noting that by summary judgment the plaintiff must make a "commitment to the theory of its case") (citation omitted)

United States District Court
For the Northern District of California

1   2919520, at *7 (N.D. Cal. June 26, 2014) ("Defendant moves for summary judgment on Plaintiff's

2   claims for breach of warranty.  Plaintiff failed to address there arguments in his opposition brief, and

3   therefore conceded these claims."); *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir.

4   2005) (noting that the Plaintiff "abandoned her other two claims by not raising them in opposition to

5   the County's motion for summary judgment").

6   B.   RMBT's and Global's Motion for Summary Judgment on Newton's Aiding-and-Abetting

7        Claims Is Denied

8         The last ground for summary judgment is raised by both Global and RMBT.  They argue that

9   they are entitled to summary judgment because there is no cause of action under the UCL for aiding-

10  and-abetting a violation of California's Proraters Law.  Docket No. 238 at 18-20.  This argument has

11  already twice been explicitly rejected by this Court in written orders.  *See* Docket Nos. 204, 223.

12  And it has also been rejected by numerous California courts that have expressly found that aiding-

13  and-abetting liability exists for UCL claims.  *See People v. Toomey*, 157 Cal. App. 3d. 1, 15 (Cal.

14  1984) ("[I]f the evidence establishes defendant's participation in the unlawful practices, either

15  directly or by aiding and abetting the principal, liability under [the UCL] can be imposed.")

16  (citations omitted); *see also* Stern, *Business and Professions Code §17200 Practice*, 6:6 (Rutter

17  Group 2014 ed.) (noting that California courts recognize six forms of secondary liability under the

18  UCL, including aiding and abetting, and collecting cases).  The cases cited by Defendants in support

19  of their motion do not hold otherwise.  *See, e.g.*, *DuFour v. Be., LLC*, No. C 09-3770 CRB, 2010

20  WL 431972, at *3 (N.D. Cal. Feb. 2, 2010) (addressing whether aiding and abetting liability exists

21  under the Advance Fee Talent Services Act); *Toy v. TriWire Engineering Solutions, Inc.*, No. C 10-

22  1929 SI, 2010 WL 3448535, at *3 (N.D. Cal. Sep. 1, 2010) (striking UCL aiding and abetting

23  allegations without analysis because plaintiff failed to cite any relevant authorities).

24         In fact, not only did the Court previously find that both Global and RMBT can be held liable

25  under the UCL for aiding-and-abetting ADS's and QSS's violations of the Proraters Law, the Court

26  further held that Newton had submitted sufficient evidence to proceed to trial on these claims.  *See*

27  Docket No. 204 at 21 (holding that there is "sufficient evidence to infer that both [Global] and

28  RMBT aided and abetted violations of the licensing provision"); *id.* at 22 (holding that the "facts

United States District Court

For the Northern District of California

1  create a genuine issue of whether [Global] and/or RMBT aided-and-abetted ADS and QSS in

2  violating the Proraters Law's maximum charge provision").  RMBT and Global never filed a motion

3  for reconsideration of this Court's earlier orders.  Their attempt to get a third bite at the apple is

4  untimely, in violation of this Court's Standing Orders, and ultimately unpersuasive.  Global's and

5  RMBT's summary judgment motion regarding aiding-and-abetting liability is denied.[16]

6                                    **IV.    CONCLUSION**

7          RMBT's motion for summary judgment on Newton's UCL claims predicated on violations

8  of the FDIC Order is granted because this Court lacks jurisdiction to adjudicate these claims.

9  Moreover, Newton abandoned her claim under the UCL's fraudulent prong.  RMBT's and Global's

10  motion for summary judgment on Newton's aiding-and-abetting claims, however, is once again

11  denied.

12          This order disposes of Docket No. 238.

13

14          IT IS SO ORDERED.

15

16  Dated:  December 16, 2014

17

18                                            _____
                                            EDWARD M. CHEN
19                                            United States District Judge

20

21

22

23

24

25

26

27     _____

28     [16] Counsel for RMBT and Global are warned that attempting to relitigate settled issues
       without complying with proper procedures, such as seeking leave to file a motion for
       reconsideration, as was done here, is sanctionable conduct.