UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER L. NEWTON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>AMERICAN DEBT SERVICES, INC., *et al.*,<br><br>　　　　Defendants.<br>_____/ | No. C-11-3228 EMC<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTING CLASS COUNSEL**<br><br>**(Docket Nos. 287, 309)** |

## I. INTRODUCTION

Plaintiff Heather Newton seeks to represent a class of California consumers against Defendants Global Client Solutions (Global) and Rocky Mountain Bank and Trust (RMBT) for violating California's Unfair Competition Law (UCL). Specifically, Newton alleges that Global and RMBT violated the unlawful and unfair prongs of the UCL by conspiring with and/or aiding-and-abetting its former co-defendants American Debt Services (ADS) and Quality Support Services (QSS)[1] in violating California's Proraters Law.[2] *See* Docket No. 287 (Motion for Class Certification). Even more specifically, Newton claims that she will prove at trial that: (1) Global conspired with ADS and QSS to prorate without a license, in violation of California law; (2) Global and RMBT aided-and-abetted ADS and QSS in prorating without a license; (3) Global conspired with ADS and QSS to charge prorating fees in excess of those permitted under California law; and

---

[1] Global and RMBT are the only remaining defendants after ADS and QSS defaulted. Docket Nos. 156, 199 (Entries of Default).

[2] Codified at Cal. Fin. Code § 12000, *et seq*.

(4) Global and RMBT aided-and-abetted ADS and QSS in charging prorating fees in excess of those permitted under California law.[3] *See id.* Newton seeks both restitution and injunctive relief on a classwide basis.

Defendants resist class certification on two grounds. First, they argue that Newton's proposed class definition is impermissibly broad because it would sweep in thousands of individuals who had no business relationship with ADS, and thus who could not have been harmed by the precise conspiracy or scheme that Newton has targeted throughout the four years of this litigation. As explained below, the Court agrees with Defendants; Newton's initial proposed class definition is too broad. However, the Court disagrees with Defendants' additional contention that Newton cannot certify any class action under Federal Rule of Civil Procedure 23. Newton has successfully demonstrated that her narrowed class meets all of the requirements of Rule 23(a), that common issues will predominate over individualized questions, and that class adjudication of Newton's claims will be superior to piecemeal litigation. Thus, her lawsuit may proceed as a certified class action. Moreover, the Court finds Newton's counsel up to the task of adequately representing the class, and therefore appoints Newton's attorneys as class counsel.

## II. BACKGROUND

A. Factual Background

The Court has described the factual and procedural background of this case in significant detail in a number of its prior orders. *See, e.g.*, *Newton v. American Debt Servs., Inc.* --- F. Supp. 3d ---, 2014 WL 7183930 (N.D. Cal. 2014); *Newton v. American Debt Servs., Inc.*, 2013 WL 5592620 (N.D. Cal. Oct. 10, 2013). What follows is a brief recitation of the facts germane to the instant class certification motion.

Defendants ADS, QSS, Global, and RMBT collectively provided debt settlement services to Newton. ADS is a debt settlement company that advertised its services online to consumers. *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Depo., at pg. 16). In August 2009, Newton

---

[3] This Court previously ruled that RMBT could not conspire to violate the Prorater's Law because banks are exempt from that law's requirements, and a firm cannot conspire to violate a law that it could not violate directly. *See* Docket No. 204 at 18.

2

responded to an ADS advertisement. Docket No. 288 (Newton Decl.) at ¶ 6. According to Newton, an ADS salesman told her that ADS could settle her outstanding credit card debt for "around half the balance owed." *Id.* Newton subsequently signed up for ADS's services online, and the parties agreed that ADS would provide "debt settlement and restructur[ing] services," which involved ADS negotiating with Newton's creditors in order to reduce her debts and formulate a payment plan. *See* Docket No. 146-1 (Ex. A to Leonard Decl., at pg. NEWTON_00054).

For its part in the debt settlement enterprise, QSS agreed to provide "customer service functions" to process debt settlements for ADS clients. *See* Docket No. 185 (Ex. 3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00057). That is, QSS apparently provided a full range of back-end support to ADS (and other alleged "front-men" in the debt settlement industry), including marketing, customer service, and administrative support. *See* Docket No. 289, Ex. 8 ("QSS's particular focus is not upon direct solicitation of clients in need of debt settlement, but rather on providing account management and negotiation support and services as an independent contractor to [ADS]."). Newton has presented evidence that neither ADS nor QSS were licensed to provide debt-settlement services to California consumers, as required under the Proraters Law.[4] *See* Docket No. 251-4 (Certificates of California Department of Business Oversight indicating no record of a license for either ADS or QSS); *see also* Cal. Fin. Code § 12200 ("No person shall engage in the business, for compensation, of . . . receiving money as agent of an obligor for the purpose of paying bills, invoices, or accounts of such obligor, or acting as a prorater . . . without first obtaining a license from the commissioner."). Neither Global or RMBT appear to dispute that ADS and QSS operated without a license.

Global's role in the debt-settlement scheme was to create bank accounts for ADS clients to "accumulate and disburse funds in connection with the repayment of their debts." *See id.* (Ex. 3 to Kennedy Decl., at pg. GLOBAL-CONFIDENTIAL-00056). Essentially, Global is a payment processor for consumers who are enrolled in debt settlement programs with other companies like

---

[4] As relevant here, the Proraters Law prohibits any individual who receives money "as agent of an obligor for the purpose of paying bills, invoices, or accounts of such obligor" from operating without a license. Cal. Fin. Code § 12200. Moreover, such licensed proraters may not charge fees in excess of those provided by statute. *See* Cal. Fin. Code § 12314.

3

ADS or QSS. *See id*. Global touts itself as "a leading provider of account management services to the debt settlement industry today." *See* Docket No. 185 (Ex. 4 to Kennedy Decl.).

RMBT, a Colorado-chartered bank, agreed to provide custodial bank accounts (sometimes referred to as "Special Purpose Accounts") for "debt settlement companies and their clients," such as ADS and Newton. *See* Docket No. 185 (Ex. 2 to Kennedy Decl., at pg. RMBT-CONFIDENTIAL-00002, ¶¶ 3.1).

As part of Newton's agreement with ADS, Global opened and administered a Special Purpose Account in Newton's name at RMBT. *See* Docket No. 146-4 (Ex. D to Leonard Decl.) (Newton Dep. 36:22-38:13). Global maintained access to Newton's payment history, including how much ADS and QSS charged Newton for debt settlement services. *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶¶ 1[b], 1[d]). And Global agreed to provide ADS and QSS with access to Newton's account activity, including deposits and withdrawals. *See* Docket No. 185 (Ex. 3 to Kennedy Decl., ¶ 1[g]). RMBT had independent access to these pieces of information. *See* Docket No. 185 (Ex. 6 to Kennedy Decl.) (Hampton Depo., at pgs. 24-25). Newton claims she will prove at trial that both Global and RMBT had actual knowledge of the unlawful fees she and her fellow consumers were being charged by both ADS and QSS, and that both Global and RMBT actively assisted ADS and QSS in charging these excessive fees.

Once enrolled in the debt settlement program, Newton stopped paying her credit card bills and ceased communications with creditors pursuant to a defendant's instruction. *See* Docket No. 163 (Newton Decl. ¶ 7). According to Newton, however, none of the Defendants ever communicated or negotiated with her creditors. Docket No. 288 at ¶ 19. After learning this, Newton terminated her account with ADS. *See id*. at ¶ 21. Ultimately, Newton paid a total of $4,206.50 into her Special Purpose Account at RMBT, of which $70.04 was eventually refunded to her, $2,200 was paid to Bank of America pursuant to a settlement Newton reached without assistance, and the balance of which Defendants kept. *See id*. at ¶ 22. Records maintained by Global confirm that Newton was charged $1,936.46 in "Customer Fees" and "Transaction Fees." *See* Docket No. 185 (Ex. 1 to Kennedy Decl., at pgs. GLOBAL.R26.00003-GLOBAL.R26.00005). This amount is well in excess of that allowed under the Proraters Law, which provides:

4

> the total charges received by a prorater, or any other person for the prorater's services, may not exceed in the aggregate twelve percent (12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000), and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor, except for payments made on recurrent obligations.

*See* Calif. Fin. Code § 12314.  Indeed, because Newton claims no Defendant ever made a single payment to a creditor on her behalf, these firms were arguably not entitled to charge Newton even one cent of prorating fees, let alone nearly two thousand dollars in such fees.  *See id.*

B. <u>Procedural History</u>

Newton filed this putative class action on behalf of herself and similarly situated consumers in June 2011.  Docket No. 1.  After years of litigation, the case has been considerably narrowed, and only two UCL claims remain.  Specifically, Newton claims that defaulted defendants ADS and QSS violated the unlawful prong of the UCL where they prorated without a license, and where they charged fees in excess of the statutory maximum provided under the Proraters Law.[5]  Alternatively, Newton alleges that ADS and QSS contravened the unfair prong of the UCL by artificially "splitting-up" the work of a prorater among various entities in order to avoid violating the letter of the Proraters Law, while nevertheless violating its spirit.

Newton claims that Global may be held indirectly liable for the above-described UCL violations because Global: (1) conspired with ADS and QSS to violate the Proraters Law; and/or (2) aided-and-abetted ADS's and QSS's violations of the Proraters Law.  Newton also claims that RMBT can be held indirectly liable for ADS's and QSS's violations of the UCL under an aiding and abetting theory.

Pending before the Court is Newton's motion for class certification.  Docket No. 287.  Newton proposes to represent the following class of consumers against Global and RMBT:

> All consumers in California who paid QSS directly, or indirectly through a person or entity that contracted with QSS, for debt settlement services during the four years preceding filing of the

---

[5] Newton must pursue the Proraters Law claims indirectly through the UCL because there is no private right of action under the Proraters Law.  *See Newton v. American Debt Servs., Inc.*, 2013 WL 5592620, at *10 (N.D. Cal. Oct. 10, 2013).  For a lengthy discussion of Newton's UCL claims, *see, e.g.*, *Newton*, 2014 WL 7183930, at *5-7.

5

>complaint, who opened a Special Purpose Account with RMBT to be administered by [Global], and did not receive a full refund of all fees and charges paid to all Defendants.

Docket No. 287 at 4.

### III. DISCUSSION

Defendants raise a host of arguments against Newton's bid for class certification. A number of these arguments are entirely irrelevant.[6] And the substantial majority are without merit. But Defendants do make one valid point – Newton's proposed class definition is too broad because it is not limited to those individuals who actually did business *with ADS*, the alleged "front-man" for the debt settlement enterprise Newton challenges in this lawsuit. Thus, the Court considers whether certification of a narrower class is appropriate. The Court concludes that it is, because Newton's proposed narrower class meets all of the requirements of Rule 23. Moreover, after receiving additional information from Newton's attorneys at the hearing for this matter, the Court is satisfied that Newton's counsel will fairly and adequately represent the interests of the class, and thereby appoints them class counsel.

A.  Legal Standard Under Rule 23

Rule 23 of the Federal Rules of Civil Procedure permits Plaintiffs to sue as representatives of a class only if:

>(1) the class is so numerous that joinder of all members is impracticable;
>
>(2) there are questions of law or fact common to the class;
>
>(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
>(4) the representative parties will fairly and adequately protect the interests of the class.

---

[6] As an example, Defendants spend the first six pages of their opposition brief once again attempting to relitigate the merits of this dispute. For instance, a non-party debt settlement company apparently just entered into a consent decree with the State of California that purportedly allows the non-party to structure its settlements "just like Newton's account," and a number of states (but notably not California) have supposedly adopted debt resolution laws that would bless Defendants' alleged conduct here. *See* Docket No. 296 (Opposition Br.) at 5.

United States District Court
For the Northern District of California

Fed. R. Civ. P. 23(a)(1)-(4).  The purpose of these Rule 23(a) requirements is to "ensure that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and to "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (internal quotation marks, modifications, and citations omitted).

If the Rule 23(a) requirements are satisfied, the purported class must be certified under Rule 23(b) by satisfying any one of its three prongs.  The prong under which Newton seeks certification permits classwide treatment if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

B.   Newton's Proposed Class Definition Must Be Narrowed

Newton seeks to represent the following class of individuals:

> All consumers in California who paid QSS directly, or indirectly through a person or entity that contracted with QSS, for debt settlement services during the four years preceding filing of the complaint, who opened a Special Purpose Account with RMBT to be administered by [Global], and did not receive a full refund of all fees and charges paid to all Defendants.

Docket No. 287 at 4.  As Defendants correctly point out, there is a notable problem with this class definition – it is not limited to California consumers who contracted with or otherwise paid *ADS* to provide debt settlement services.  Instead, Newton wants to represent consumers who did business with other alleged proraters.  *See id.* (seeking to represent "All consumers in California who paid QSS directly, *or indirectly through a person or entity that contracted with QSS*, for debt settlement services . . .") (emphasis added).  In order to adequately represent such class members, however, Newton would need to be prepared to prove at trial that these still unidentified third-parties violated the letter or spirit of the Proraters Law, that the UCL was therefore violated, and that Global and RMBT either conspired with or aided-and-abetted these other unidentified debt settlement companies, thus indirectly violating the UCL themselves.

7

Newton makes absolutely no showing that she is capable of proving multiple conspiracies in this case, or of otherwise representing consumers that did business with other debt-settlement companies besides ADS. Indeed, Newton's motion for class certification does not even indicate that she knows who these other debt settlement companies are. Left unclear is how Newton plans to prove that Global conspired with (or RMBT aided-and-abetted) unknown co-conspirators, and it is similarly mystifying how Newton could purport to represent California consumers who apparently did business with these unnamed outfits (and with which Newton had no dealings).

Nor would it be fair to Defendants to allow Newton to attempt to prove such additional conspiracies even if she could. Since the complaint in this case was first filed over four years ago, Newton's theory of the case has been that Global and RMBT assisted ADS and QSS violate the Proraters Law. Nothing in the manner this case has been litigated would have put Global and RMBT on sufficient notice that Newton also intended to prove that Defendants conspired with and/or aided-and-abetted *other* unnamed debt settlement companies that partnered with QSS. Newton's proposed class cannot be so certified.[7]

Fortunately for Newton, however, a simple change she proposed to the class definition cures this problem. *See* Reply Br. at 6 (providing an alternate and more focused class definition for possible certification if the Court agrees with Defendants that her initial class cannot be certified as defined). Tightening the class definition to require that all class members actually did business with ADS, as Newton did herself, renders the class potentially certifiable. Thus, the Court will consider whether the following narrower class can be certified under Rule 23:

> All consumers in California who paid QSS directly, or *indirectly through ADS*, for debt settlement services during the four years preceding filing of the complaint, who opened a Special Purpose Account with RMBT to be administered by [Global], and did not receive a full refund of all fees and charges paid to all Defendants.

---

[7] In addition to the reasons explained in the main text, it is worth noting that Newton's proposed class likely could not be certified because she has not demonstrated her claims would be "typical" of her fellow class members under her broader class definition. *See* Fed. R. Civ. P. 23(a)(3). Nor has she demonstrated that common questions would likely predominate over individual issues if her class swept in a multitude of additional co-conspirators and alleged conspiracies, the facts of which are not alleged or described. *See* Fed. R. Civ. P. 23(b)(3).

8

C. The Proposed Class is Ascertainable and Sufficiently Numerous

Before analyzing numerosity under Rule 23(a)(1), courts typically require the named plaintiff to demonstrate that their proposed class is ascertainable. *See Daniel F. v. Blue Shield of California*, — F.R.D. —, 2014 WL 3907150, at *4 (N.D. Cal. 2014); 7A Charles Alan Wright *et al.*, Federal Practice and Procedure § 1760 at 142-47 (3d ed. 2005). To be ascertainable, the description of the class must be "definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member" before trial, and by reference to "objective criteria." *Daniel F*, 2014 WL 3907150, at *4 (citations omitted).

Defendants argue that the class here is not ascertainable because it "does not actually describe a violation of any law or anticipate that one is needed." Opp. at 8. Defendants' argument has the law backwards. Class definitions that are merits-based (also known as "fail-safe" classes) are *not* ascertainable because it is impossible to know who is a member of such a class in advance of trial.[8] *See Daniel F*, 2014 WL 3907150, at *4 ("A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class."). The problem with a fail-safe class definition is obvious – if the plaintiff wins, the class has an ascertainable number of members, but if the plaintiff loses the class has zero members, and the defendant's victory is hollow because it does not bind anyone.

In any event, Defendants actually concede this class is ascertainable – albeit without recognizing the concession – by stating the precise number of class members that are in Newton's proposed class: 385. Opp. Br. at 9 (stating that Global's records show that 385 California consumers "received services from QSS and held accounts at RMBT that were administered by Global" and who also "signed contracts and received services from ADS"). It goes without saying that if the Defendants can objectively determine the precise number of class members there are before trial, the

---

[8] For instance, "a class defined as 'All shareholders of Acme. Corp who bought shares because of Acme's fraud and lost money when that fraud was revealed' requires a ruling on the merits of the plaintiff's claim" in order to determine who is, or is not, a member of the class. *See* Brian Anderson and Andrew Trask, *The Class Action Playbook* § 2.1.2 (Oxford University Press ed. 2010). By contrast, a class defined as "'All shareholders of Acme Corp. as of December 31, 2010' is an ascertainable class because it requires only a single [non-merits based] factual inquiry to determine who is in the class." *Id.*

1 class is ascertainable. In any event, even if the precise number is not 385, given the narrowed class
2 definition, the members of the class are ascertainable.

3 Defendants' concession also satisfies Rule 23(a)(1)'s numerosity requirement. Again,
4 Defendants contend there are 385 members in Newton's proposed class. A plaintiff satisfies the
5 numerosity requirement if "the class is so large that joinder of all members is impracticable."
6 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). In this case, Newton easily meets
7 the numerosity requirement. *See Wang v. Chinese Daily News*, 231 F.R.D. 602, 607 (C.D. Cal.
8 2005) (recognizing there is a presumption of numerosity where proposed class contains 100 or more
9 members), *reversed on other grounds by* 737 F.3d 538 (9th Cir. 2013); *Ikonen v. Hartz Mountain
10 Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1998) (finding a proposed class of forty members sufficient to
11 satisfy numerosity) (citation omitted). Defendants cite no authority to the contrary.

### D. Newton Has Identified a Number of Common Issues

In order to satisfy Rule 23(a)(2)'s commonality requirement, a plaintiff must "affirmatively demonstrate" that their claims "depend upon a common contention" the truth or falsity of which "will resolve an issue that is central to the validity of each one of the [class members'] claims in one stroke." *Dukes*, 131 S.Ct. at 2551. That is, the lawsuit must call upon the court or jury to decide at least one factual or legal issue whose outcome logically must be the same for each class member. *Id.* at 2256 (holding that "[e]ven a single [common] question" will suffice to satisfy Rule 23(a)).

Here, Newton has identified a number of questions that will "generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2251 (citation omitted). For instance, at least the following questions will have a common answer that will apply equally to all class members, and thereby drive the resolution of the litigation:

- Did ADS receive money for the purpose of distributing it among creditors, making the Proraters Law applicable to it?
- Did QSS actually or constructively receive money for the purpose of distributing it among creditors, making the Proraters Law applicable to it?
- Did Global receive money for the purpose of distributing it among creditors, making the Proraters Law applicable to it?

10

- If the Proraters Law applies, did ADS have a license to operate as a prorater?
- If the Proraters Law applies, did QSS have a license to operate as a prorater?
- If the Proraters Law applies, did any Defendant charge fees in excess of the fees cap?
- Was ADS's and QSS's conduct unlawful under the UCL?
- Was ADS's and QSS's conduct unfair under the UCL?
- Did Global agree with ADS and QSS to violate the Proraters Law?
- Did either Global or RMBT have actual knowledge of ADS's and QSS's violations of the Proraters Law?
- Did either Global or RMBT substantially assist in ADS's and QSS's violations of the Proraters Law?

As is evident from the above list, Newton has done more than show that there is one common question that will drive the resolution of this litigation; she has shown that there are a substantial number of such issues.

Defendants' response to Newton's very strong showing on commonality is non-sensical. Take, for instance, Newton's contention that common questions in this litigation will include whether or not Global or RMBT had actual knowledge of ADS's and QSS's supposed violations of the Proraters Law,[9] and whether they substantially assisted that scheme (*i.e.*, whether they aided-and-abetted the unlawful conduct). Defendants respond that "Newton only advises the Court of what proof will answer these questions, but this is not the standard required by *Dukes* – she does not even mention the 'how,' let alone *affirmatively show* how answers to these questions will drive the resolution of this proceeding." Opp. Br. at 17 (emphasis in original). But the "how" is abundantly clear: If Newton shows Global or RMBT had actual knowledge of ADS's or QSS's Proraters Law violations, and that either entity substantially assisted in those violations, she will have shown that those entities are indirectly *liable* for UCL violations as aiders and abettors. It goes without saying

---

[9] At an even finer level of detail, the common questions would be whether Global or RMBT had actual knowledge that ADS or QSS were unlicensed and/or whether they knew that ADS or QSS charged fees in excess of the statutory cap.

11

that proving a party's liability will "drive the resolution of the proceeding." Defendants' opposition to the commonality element is entirely without merit.

E. <u>Newton Has Satisfied Typicality</u>

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Representative claims are "typical" if they are "reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The test of typicality is whether other members of the class "have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiff[], and whether other class members have been injured by the same course of conduct." *Daniel F.*, 2014 WL 3907150, at *10 (internal quotation marks and citation omitted).

Here, the typicality element seems plainly met. Newton claims she will prove at trial that she was charged excessive and illegal fees in connection with her debt settlement in violation of the Proraters Law. She further alleges that Global and RMBT were instrumental in the collection of these illegal fees because they either conspired with or aided-and-abetted ADS or QSS in charging those fees. And Newton further claims that she was not issued a refund of all of the illegal fees charged. According to Newton, all putative class members suffered the exact same injury – the imposition of illegal fees by Defendants in violation of the Proraters Law. She further alleges that these consumers did not receive refunds. Thus, Newton's claims are typical of her fellow class members' claims.

Moreover, Defendants' defenses will also be roughly the same for each class member. For instance, Defendants argue that they did not violate the Proraters Law and that they did not conspire with or aid-and-abet ADS's and QSS's alleged violation of the Proraters Law. If these defenses are proven at trial they will defeat not just Newton's claims, but those of her fellow class members as well. Thus, typicality is clearly established.

F. <u>Newton is an Adequate Class Representative</u>

Rule 23(a)(4) requires a showing that the putative class representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A named plaintiff satisfies

the adequacy test if the individual has no conflicts of interest with other class members and if the named plaintiff will prosecute the action vigorously on behalf of the class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011).

Here, Defendants do not challenge Newton's adequacy to serve as class representative, and there is no evidence in the record to warrant any doubt on this issue. As discussed above, Newton's claims appear typical of her fellow class members' and so there is no obvious conflict of interest here. Moreover, Newton filed a declaration attesting to the significant efforts she has already made prosecuting this action since 2011. *See* Docket No. 288 at ¶¶ 3-4 (declaring that Newton has had frequent meetings with her counsel, sat for deposition and attended settlement conferences in this litigation). Thus, the final Rule 23(a) requirement is satisfied.

G.     Newton Has Shown That Common Questions Will Predominate Over Individual Inquiries

In addition to satisfying the Rule 23(a) criteria, Newton must also satisfy Rule 23(b)(3), which permits the Court to certify a class action where the named plaintiff demonstrates that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

While Rule 23(a)(2) asks whether a putative class representative can identify at least one "common contention" that is "capable of classwide resolution," Rule 23(b)(3) "focuses on 'the relationship between the common and individual issues.'" *Daniel F.*, 2014 WL 3907150, at *11 (quoting *Hanlon*, 150 F.3d at 1022). There is only "justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022. Thus, as the Supreme Court and other federal courts have explained, to certify a class under Rule 23(b)(3), a putative class plaintiff must show both (1) that the liability of the defendant to the class members can be proved with some evidence that is common to the class rather than to its individual members, and (2) that damages can be reasonably determined on a class wide basis using

a common damages methodology (*e.g.*, review of the defendants records, or statistical sampling). *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430 (2013).

As noted above, Newton has identified a plethora of common issues in this case that are capable of classwide adjudication. This is particularly obvious with respect to Newton's "unlawful" prong claims. In order to prevail on the unlawful prong, Newton must show that ADS and QSS violated statutory requirements. For instance, Newton must show that ADS and QSS prorated without a license. Whether these parties violated the law is a question that can be established with common proof, and the answer will necessarily be the same for all class members. Either ADS and QSS charged illegal fees or they did not. Either they prorated without a license, or not. As another federal court recognized in certifying a similar class action against debt settlement companies under Washington law, predominance is very likely satisfied where the plaintiff alleges *per se* violations of law. *See Brown v. Consumer Law Associates, LLC*, 283 F.R.D. 602, 615 (E.D. Wash. 2012) (finding predominance easily satisfied where common question of law was whether debt service companies violated Washington's Debt Adjusting Act by charging class members an initial fee in excess of the statutorily proscribed amount, and charging services fees that exceeded the statutory maximum of "15% of any one individual payment").

Other substantial questions of liability under the unlawful prong of the UCL are similarly capable of classwide adjudication. For instance, whether Global conspired to violate the Proraters Law with ADS and QSS is a question that will resolve Global's liability vis-a-vis all proposed class members, and which can be proven with common proof of whether Global agreed with ADS and QSS to prorate without a license or charge fees in excess of the California fees cap. Newton's aiding and abetting claim against RMBT will similarly raise only common issues that admit no variation between class members. Either RMBT had actual knowledge of ADS's and QSS's law violations, and acted with the intent to substantially assist ADS and QSS in violating the Proraters Law, or it did not. RMBT's liability is an all-or-nothing proposition that does not admit individual variation.

Defendants argue that individualized issues will overwhelm common questions when it comes time to calculate restitution, but Defendants are mistaken. Determining both eligibility for

restitution, and the amount of any restitution award, is straightforward using Defendants' own records. First, the amount of restitution is easily determined because that amount is set by statute. If the Defendants charged *any* fees in excess of the fees cap, the Defendants must return "all charges received from the debtor." Cal. Fin. Code § 12316.[10] Because Defendants know the total amount of charges they received from each debtor, Defendants can easily and definitively determine the appropriate amount of restitution. *See* Docket No. 289, Ex. 3 (Newton's account records with Global, which clearly indicate the total amount of fees charged by Defendants).

Determining whether a class member is eligible for restitution is similarly elementary. Defendants merely have to consult the class member's records, determine the total amount of money distributed by Defendants to that class member's creditors, determine the total amount of money received by Defendants in fees, and assess whether the amount received in fees exceeded the cap.[11] The Defendants' records for Newton's account indicate that this is an exceedingly simple calculation to perform, as all credits and debits from her RMBT account are individually itemized, and indicate whether a transaction is a fee or payment.[12] *See* Docket No. 289, Ex. 3. Indeed, Newton alleges that during discovery the Defendants already calculated a very close approximation of the total number of California consumers who were charged fees in excess of the Proraters Law fees cap, although Newton seemingly failed to provide the Court with a copy of the relevant discovery response. The following, however, is block-quoted in Newton's reply brief:

---

[10] The full text of this section reads: "If a prorater contracts for, receives or makes any charge in excess of the maximum permitted by this division, except as the result of an accidental or bona fide error, the prorater's contract with the debtor shall be void and the prorater shall return to the debtor all charges received from the debtor."

[11] Recall that the Proraters Law provides that "the total charges received by a prorater, or any other person for the prorater's services, may not exceed in the aggregate twelve percent (12%) for the first three thousand dollars ($3,000), eleven percent (11%) for the next two thousand dollars ($2,000), and ten percent (10%) for any of the remaining payments distributed by a prorater to the creditors of a debtor, except for payments made on recurrent obligations." Cal. Fin. Code § 12314.

[12] Defendants argue without citation or support that determining whether the fees cap is violated requires individualized inquiries into "the dates on which all such fees were paid." Opp. Br. at 10. This is false. The Proraters Law applies to fees paid in the "aggregate." *See* Cal. Fin. Code § 12314. For example, if Defendants charged more than 12% of the *total* funds disbursed to creditors under $3,000, they violated the fees cap. *Id.* By the statute's express language, it is irrelevant when the fees were charged or when the payments were made.

> Interrogatory No. 10: With respect to consumers in California that contracted to receive debt settlement services from [QSS] and on whose behalf you [*i.e.*, Global] agreed to perform services related to Special Purpose Accounts on or after June 29, 2007, how many customers paid a fee amounting to more than 12% of the dollar amount YOU caused to be distributed to that consumer's creditors?
>
> Amended Answer: For the referenced consumers, whom are identified on the spreadsheet labeled as [Bates Number], the answer is as follows:
>
> For account holders enrolled from 6/29/2007-6/30/2009:
> 1. Paid fees to QSS exceeding 12% of payments made to creditors - 3,070
> 2. Paid fees to Global exceeding 12% of payments made to creditors - 1,685 . . .

Reply Br. at 4-5.[13]

Put simply, in order to determine whether restitution is warranted, Global or RMBT only need to perform one calculation using their own records; divide the total amount of fees a class member was charged by the total amount of money disbursed to that class member's creditors. If that percentage exceeds the statutory cap, Global does not need to do anything else to determine the amount of restitution – it simply needs to refund *all* fees charged to the class member. This is a simple and common damages model that does not unduly involve individual questions or admit individual complications. The same methodology applies to the entire class. *See Brown*, 283 F.R.D. at 615 (noting that Rule 23(b)(3) predominance was satisfied where the only "individualized questions are (1) the total amount of payments made by each class member to [Defendant]; and (2) the proportion of those payments which were ultimately distributed to creditors. These individualized questions can . . . be answered relatively quickly by examining each class member's billing history"). Hence, common questions clearly predominate with respect to Newton's unlawful prong claims.

While the case for certification under the unfair prong is more complicated, the Court ultimately believes these claims would also raise a number of common issues that would

---

[13] Of course, this discovery response does not quite reveal the number of persons who paid fees in excess of the fees cap, because it does not take into account the varying cap amounts. But assuming this discovery response was not simply fabricated by Newton, it demonstrates that it should be easy for Global to determine fees cap violations using its own records.

predominate over individual ones. Recall that Newton's unfair prong claim alleges (as an alternative theory of recovery to her unlawful prong claim) that even if ADS's and QSS's behavior did not actually violate the letter of the Proraters Law because of the way the Defendants structured their affairs (*i.e.*, the Proraters Law is not technically violated because the Defendants split up the various duties of a prorater amongst themselves) the fees charged were nevertheless unfair in violation of the UCL. To prevail, Newton would have to show that the "challenged business practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers'" and the court would then need to "'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 476 (N.D. Cal. 2014) (quoting *Drum v. San Fernando Valley Bar Ass'n*, 184 Cal. App. 4th 247, 257 (2010)).

A number of courts have recognized that where a plaintiff's claim under the "unfair" prong "hinges on the existence of a uniform business practice or series of practices amenable to some degree of precise definition," certification of a Rule 23(b)(3) class may be warranted. *Herskowitz*, 301 F.R.D. at 476; *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 737 (9th Cir. 2007) (affirming certification of class action under UCL's unfairness prong where district court "found that Lozano's claim was based on uniform disclosures made by [Defendant] to all its consumers"). Here, the alleged "unfair" conduct appears uniform across all class members – either Newton will be able to show that Defendants structured their affairs to charge excessive prorating fees, or not. And the Court may make one uniform determination of whether the utility of the conduct outweighed the harm to class members. Because no individualized inquiries seem required under the unfair prong, Rule 23(b)(3)'s predominance element is satisfied. Even if some individual inquiry were required, it is clear here that commonality predominates.

H. <u>Class Adjudication is Superior to Alternative Methods</u>

In order to certify this class under Rule 23(b)(3), the Court must also be convinced that class adjudication of Newton's claims is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). When ruling on superiority, the Court should consider

17

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first question asks whether class members have an interest in individually litigating against defendants on the class claims. Evaluation of this inquiry turns on the cost of litigating the class members' claims, the complexity of the issues surrounding those claims, and the amount of damages available. Put simply, "the less the lawsuit is worth, the more likely it is that individuals will have no interest in controlling their own lawsuits." Anderson and Trask, *supra*, at § 2.7.2. Here, the first factor favors a finding of superiority. Newton's claim is worth less than $2,000, and she avers (and Defendants do not dispute) that her fellow class members' claims are similarly fairly small. It is simply not worth taking an individual claim to trial in order to win a $2,000 restitution award. This is particularly true where the claims and theories of liability are potentially complicated. Hence, class adjudication is superior to seriatim litigation in this situation.

The remaining three factors are also satisfied. The second superiority factor is met because there are no other litigations currently pending against the Defendant regarding the class claims. The third factor is met because, as discussed above, the issues to be litigated at trial appear to be largely common issues that apply to all class members. Where a single trial will resolve nearly all relevant issues on a classwide basis, efficiency favors "concentrating the litigation of the claims" in the particular forum. Fed. R. Civ. P. 23(b)(3)(C). And the final superiority factor is met because Defendants have not shown why this litigation cannot be easily managed, especially given the substantial number of common issues presented in this case.

In conclusion, Newton has satisfied the requirements of Rule 23(a) and 23(b)(3). A class will be certified, as defined above. The parties shall meet and confer regarding the form and logistics of distributing class notice. A proposed class notice shall be submitted to the Court for its approval no later than **June 30, 2015**. All other deadlines remain as set in this Court's most recent minute order. *See* Docket No. 312.

I.      Newton's Attorneys are Appointed Class Counsel

Under Rule 23(g), the Court must appoint class counsel if it certifies a class. In doing so, the Court "must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; (iv) the resources that counsel will commit to representing the class . . . [and] any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(A)-(B). Rule 23(g) also provides the Court with authority to "order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs." Fed. R. Civ. P. 23(g)(1)(C).

Newton's counsel have been litigating this case for four years, have engaged in extensive motions practice, and have even obtained a favorable ruling from the Ninth Circuit affirming this Court's order denying Defendants' motion to compel arbitration. *See Newton v. American Debt Servs., Inc.*, 549 F. App'x 692 (9th Cir. 2013). The Court has no doubt that the first Rule 23(g) factor is satisfied here.

The Court is satisfied that the second factor (counsel's experience) is similarly met. Newton's counsel submitted declarations detailing their respective experiences litigating class and individual actions. *See* Docket No. 288 (Dumont Decl.); Docket No. 289 (Kennedy Decl.). Moreover, counsel provided additional information regarding their litigation history in response to this Court's questions at the hearing on this matter. In light of the information disclosed in the declarations and at the hearing, the Court is satisfied that Newton's counsel will fairly and adequately represent the interests of the class, either during settlement or at trial. Similarly, the Court is satisfied from the filings, statements made on the record, and counsel's litigation history in this case that Newton's attorneys satisfy the third Rule 23(g) requirement (knowledge of the applicable law).

Finally, the Court is satisfied that putative class counsel have the necessary resources to try this class case, or otherwise see it through to settlement. *See* Dumont Decl. at ¶ 12; Kennedy Decl. at ¶ 18. In addition to statements contained in their declarations, counsel provided relevant

information at the hearing regarding their resources to handle this matter. As counsel noted, they have funded Newton's litigation of this case for four years already. And the remaining steps in this case are unlikely to be exceedingly costly. Counsel do not anticipate hiring experts, nor are class notice costs expected to be particularly burdensome given the fairly small class size (*i.e.*, 385 members). Put simply, the Court is convinced that counsel have the resources necessary to see this case through for the benefit of the class members. Thus, the Court appoints Mr. Kennedy and Ms. Dumont lead counsel in this certified class action.

## IV. CONCLUSION

The Court certifies a Rule 23(b)(3) class defined as follows:

> All consumers in California who paid QSS directly, or indirectly through ADS, for debt settlement services during the four years preceding filing of the complaint, who opened a Special Purpose Account with RMBT to be administered by Global, and did not receive a full refund of all fees and charges paid to all Defendants.

The Court appoints Newton's attorneys, Mr. Kennedy and Ms. Dumont, as class counsel.

This order disposes of Docket Nos. 287 and 309.

IT IS SO ORDERED.

Dated: June 9, 2015

_____
EDWARD M. CHEN
United States District Judge